THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FRED BRADLEY, Defendant-Appellant.

First District (6th Division)   No. 1—90—0630

Opinion filed October 11, 1991.

Martha Conrad, of Chicago, and McNally & Robinson, of Frankfort, Kentucky (Kevin McNally and Gail Robinson, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Judith Pietrucha, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

After a jury found defendant-appellant Fred Bradley guilty of the murder of his wife, Mary Lou Bradley, the trial judge granted defendant's amended motion for a new trial. However, some six months after the granting of defendant's new trial motion, the trial court set aside its order granting defendant a new trial, reinstated defendant's conviction, and sentenced defendant to a term of 25 years' imprisonment.

The following testimony was elicited at the hearing on defendant's motions to suppress evidence. Arlington Heights police investigator William Martin testified that on December 23, 1986, defendant was brought to Martin's office. Defendant told Martin that he (defendant) had just killed his (defendant's) wife. Defendant gave Martin the address of where the victim was. According to Investigator Martin, defendant again stated that he had killed his wife, adding that he had choked her until she did not move. Defendant was placed in an interview room while Martin and three other police officers proceeded to the address where defendant indicated the victim could be found.

Upon entering the residence located at 838 S. Vail, the officers found the victim lying on the floor between the kitchen and living room. The officers stayed at the scene for some 30 minutes, securing the scene for the evidence technicians. Investigator Martin did not touch anything, although he was aware that the evidence technicians collected evidence, including some guns and some papers. Also, according to Martin, a videotape of the scene was made.

Defendant related to the investigators that he had not lived at the Vail Street home during the last six months, as defendant and the victim were in the process of a divorce. Defendant had previously been ordered by a court to stay away from the residence (although at the time of the occurrence that court order had expired). The residence was owned jointly by defendant and the victim.

Arlington Heights police evidence technician Michael Miljan testified that he had responded to an investigation of a death at the Vail address. After a short briefing, Miljan entered the house and viewed the body of the victim. He checked the interior of the house, walking through all the rooms and looking for evidence of a struggle. Miljan observed no evidence of a struggle. Miljan continued with his routine, which included three walk-throughs. During his investigation of the scene, he observed several guns. Also, as Miljan investigated, he collected a calender and some papers.

Another police officer videotaped the scene of the occurrence. No search warrant had been obtained. The calendar which was seized detailed instances when defendant had physically beaten the victim. The papers which were seized related to the couple's divorce proceedings.

The following testimony was elicited at trial. Arlington Heights police sergeant Chisholm testified that defendant appeared in the lobby of the Arlington Heights police station on the morning of December 23, 1986, appropriately dressed for the cold weather. According to Chisholm, defendant stated "I just killed my wife." Defendant repeated this phrase as he was led to the detectives' office. As information regarding defendant's name, address and the like was taken from defendant, defendant spoke in a normal tone of voice.

Investigator Martin again testified at trial. Martin recounted the conversation he had with defendant in his office. Defendant demonstrated with his hands how he had choked his wife. Martin testified that defendant was dressed normally, had no visible injuries and required no medical assistance. Martin further recounted his activities at the Vail Street residence.

Martin also testified that after he returned to the station, he interviewed defendant again. Martin read defendant his *Miranda* rights, and defendant waived his rights. Defendant said that he was separated from his wife, who was seeking a divorce, and that he resided in Cary, Illinois. Defendant told Martin that he had looked for his wife the previous night and had driven to her house and waited in his truck until dawn. He went to the front door and was allowed in the house by the victim. The two sat at the kitchen table and talked. An argument ensued. The defendant related to Martin that he (defendant) then grabbed his wife around her neck, and as they struggled, she fell to the floor. He sat on top of her, choking her until she did not respond. Defendant left the house and headed to the police station.

An assistant State's Attorney arrived to interview defendant, according to Martin. Defendant was again advised of his *Miranda*

rights, waived those rights, and repeated his statement. Martin further testified that defendant answered all questions clearly and directly. Defendant did not reveal exactly what the argument he and the victim had was about.

Dr. Tae An, a licensed pathologist working for the medical examiner's office, testified. Dr. An autopsied the victim's body and related some of the details pertaining to the condition of the body. An determined that the cause of death was strangulation.

Defendant's son, Todd Bradley, testified next. Todd Bradley had moved out of his parents' house two years prior to the death of his mother. He related that the evening before his mother's death, he and his sister Dawn saw their mother driving down the street. As the two children spoke with their mother, defendant drove up. Defendant asked the victim where she had been and where she was going. Defendant was angry, and according to Todd, said to the victim "I ought to kill you." Defendant then left.

Evidence technician Miljan again testified at the trial, relating his procedures for the gathering of evidence. Miljan related that he found an ashtray with a particular brand of cigarette butts in it and a warm pot of coffee. There were no signs of a struggle. The videotape of the scene, which had been taken by a fellow officer, was played for the jury. Also, photographs of the victim were admitted into evidence. After the testimony of Miljan, the State rested.

Defendant's first witness was Dr. Richard Abrams, a psychiatrist. Dr. Abrams testified that he first saw defendant on May 21, 1986, when he treated defendant at the psychiatric unit of Northwest Community Hospital. Defendant was recovering from alcohol and possibly drug abuse and expressed anger and disappointment over his failing marriage. Dr. Abrams had subsequent conferences with both defendant and defendant's wife. During these conferences, defendant's wife made certain remarks which Abrams felt to be inappropriate, namely, regarding picking up men at bars and sleeping with them. Abrams testified that he sought to treat the couple's "marital relationship."

Dr. Abrams testified further as to the mental condition of the victim. He described the victim as sadistic and suicidal, which Abrams attributed to the victim's violent childhood, which included suicides in the immediate family. Likewise, defendant's childhood was also violent, and Abrams believed that defendant suffered from a lack of self-esteem. Abrams recommended that the couple separate and both continue counselling. He diagnosed defendant to be an alcoholic although defendant denied drinking prior to 1986. In Abrams' opinion, defendant was suffering from a mental disease at the time defendant killed

his wife, which caused defendant to lose control. Abrams' formal diagnosis of defendant in May of 1986 was major affective depression together with alcohol abuse and mixed personality disorder. Since this diagnosis, defendant had been treated with medication and had responded well.

Abrams stated that the legal definition of sanity is someone who can control his or her behavior so that he or she does not run afoul of the law. Abrams believed that defendant knew he had done wrong after defendant strangled his wife. Abrams stated, however, that defendant's behavior was impossible to control at the time of the occurrence and that at that time defendant had been unable to conform his conduct to the law. Abrams had been aware of physical violence on the part of defendant to his wife, prior to the wife's death. Abrams had spoken to the police about the incidents and the police reports indicated that defendant was the attacker. Abrams believed the victim to be in danger, and noted that during counselling sessions with the pair, when the wife would discuss sexual liaisons with other men, defendant would become upset but was able to control his behavior. Defendant told Abrams that at the time of the incident, he was in a drunken stupor; Abrams believed, however, that defendant would have killed his wife whether defendant was drunk or sober at the time of the occurrence.

Abrams further testified that psychosis or thought disorder in an individual can come and go very quickly, from one hour to the next.

Defendant's half-brother, Wilbur Heinemann, testified next. He stated that he rarely saw defendant drink at family functions. Heinemann was unaware that defendant had a drinking problem until defendant had been hospitalized. Adelle Weinrich, a neighbor of defendant's at the Vail Street residence, testified that defendant was always helpful around the neighborhood. Defendant had a good reputation for sobriety and peacefulness. Weinrich was not aware that defendant had moved out of the Vail Street residence or that the police had been summoned to the residence numerous times in response to domestic disturbances. A close friend of defendant's and defendant's boss also testified on defendant's behalf.

Defendant testified as well. He related the history of his marriage to his wife. He said that the victim had begun psychiatric treatment for mental problems in the early 1960's. His wife often threatened suicide, although she had never really attempted to kill herself. Defendant became an alcoholic in 1986, and had several encounters with the police. According to defendant, one time in 1986, his wife held one of his guns (from a gun collection) to his head, laughed and then left.

When he and his wife were separated, she still called him often, once threatening suicide. As recently as three days before the occurrence, defendant had spent the night at the family residence.

Defendant testified that the night of December 22, 1986, he drove around looking for his wife. When he drove to the residence the morning of the 23rd, his wife came outside and invited him in the house. They sat in the kitchen and talked. They were both smoking cigarettes; he smoked Marlboros and she smoked Mores. She told him that she had spent the night with a man called Wally. The next thing defendant recalled was that she was dead, with his hands around her neck. Defendant denied coming to the house with the intent to do the victim harm.

Defendant further testified that his wife began having affairs with other men after defendant voluntarily told her that he had had an affair with another woman. He acknowledged that when the police were called to the home it was because he was drunk and beating on his wife. Although she had received an order of protection which was to keep him away from her and the house, he had ignored the order.

In rebuttal, the State presented the testimony of Dr. Gerson Kaplan, a licensed psychiatrist on the staff of Michael Reese Hospital and employed by the Cook County Psychiatric Institute. Kaplan has performed some 1,000 sanity examinations, half of which involved individuals charged with murder. Kaplan examined defendant on October 7, 1988, pursuant to court order. Prior to interviewing defendant, Kaplan looked at psychological tests performed on defendant, a social service history and the police reports concerning the incident. At the time of Kaplan's examination, defendant was coherent and oriented. Defendant did appear to be depressed and cried several times while discussing his wife. Dr. Kaplan offered a three-part diagnosis of defendant's mental condition. He found defendant to suffer from a neurotic behavior/depressive disorder, which had lasted over two years but was not severe. Further, defendant suffered from alcohol dependency. Finally, Kaplan found that the defendant had a history of substance abuse, although defendant denied a current problem. Kaplan found no evidence of psychosis, which Kaplan described as a break with reality as evidenced by delusions or hallucinations. He determined that defendant's previous hospitalizations were related to alcohol abuse, and not related to psychosis. In Kaplan's opinion, defendant was not suffering from a mental disease on the day of the occurrence such that defendant could not tell the difference between right and wrong. He believed that defendant could have conformed his actions to the law.

This opinion was based on the fact that defendant went to the police station and confessed shortly after the occurrence. This indicated that defendant understood that he had done wrong. Further, there was no evidence that defendant was psychotic at the time of the occurrence. Kaplan also noted the explanation for the crime, namely, defendant's long history of anger toward the victim and the fact that defendant had struck the victim before. The pattern of violence negated a finding of insanity. Kaplan did not equate depression with insanity, however.

Kaplan testified that it would not be possible for the defendant to simply go in and out of psychosis for a short period such as the time defendant choked his wife.

During deliberations, the jury requested to see certain police reports that had been referred to during trial. The trial court denied the request. Later in deliberations, the jury requested a further definition of the term "mental illness." The trial court refused this request. Thereafter, the jury reached a verdict, finding the defendant guilty but mentally ill in the murder of his wife.

Defendant filed a motion for a new trial on March 1, 1989. This motion was denied after a hearing. Defendant filed a second post-trial motion on March 31, 1989, arguing that defendant's conviction should be reversed due to the jury's having received an improper manslaughter instruction. On April 18, 1989, the trial court granted the motion, despite the trial court's prior finding that the provocation was inadequate. A new trial was ordered. On October 3, 1989, the State filed a motion to reconsider the granting of a new trial. After briefing and argument, the trial court granted the State's request and reinstated defendant's conviction.

The first issue we address is whether the trial court was without authority to reinstate defendant's murder conviction nearly nine months after granting defendant a new trial. Defendant argues that the trial court was without authority to reinstate his murder conviction, arguing that the trial court had no jurisdiction over the matter once a new trial had been granted defendant. Defendant implicates constitutional guarantees, although none of the authority defendant cites, whether foreign or Illinois, suggests that the issue is one involving either the Federal or State constitution. Defendant argues that a double standard is unfairly imposed, whereby the State can *ad infinitum* move to reinstate a judgment. Defendant urges that to permit the procedure employed below results in the "undermining of any finality concerning orders granting new trials."

The reasons the conviction was reinstated at the trial level are as follows. On defendant's initial motion for a new trial, defendant did not raise the issue upon which the trial court in fact later granted a new trial. The issue was only raised in defendant's "Addendum to Motion for New Trial," which was filed outside of the 30-day time period set forth in section 116—1 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 116—1). The issue defendant raised at that time was that the voluntary manslaughter instruction which was given to the jury was error under *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, a case which was handed down months before defendant's trial. When the State filed its motion to vacate the order granting defendant a new trial, it did so upon the authority of the just-released *People v. Chevalier* (1989), 131 Ill. 2d 66, 544 N.E.2d 942. This case's holding, as will be discussed, mandates that the provocation which occurred in this case was insufficient to warrant the giving of the voluntary manslaughter instruction in the first instance. Thus, the giving of the instruction invalid under *Reddick* was deemed harmless by the trial court, and defendant's conviction reinstated.

■ As to the first issue, the trial court determined that it had authority to vacate the order granting a new trial and to reinstate defendant's conviction pursuant to *People v. Thompson* (1976), 38 Ill. App. 3d 101, 347 N.E.2d 481. In *Thompson*, the defendants were found guilty on January 4, 1974, and the matter was continued to March 4, 1974. On that date, the trial court *sua sponte* vacated the earlier finding of guilt and granted defendants a new trial due to the court's finding that there was not a valid execution of jury waiver by defendants. In June of 1974, the State moved to vacate the order granting defendants a new trial, presenting the trial court with a previously unavailable transcript which clearly showed a valid jury waiver by the defendants. The trial court then sustained the State's motion to vacate the new trial order. The *Thompson* court reiterated the settled principle that "a trial judge is without authority to alter a final judgment more than 30 days after entry." (38 Ill. App. 3d at 103.) However, a trial judge does retain jurisdiction to modify an interlocutory order. (38 Ill. App. 3d at 103.) The issue for the *Thompson* court thus boiled down to whether the order granting a new trial was a final order or not. The court held that it was not, as "the judgment of the court is the sentence [citations], and it has been held that an adjudication of guilt absent a sentence is not a final judgment [citation]." (38 Ill. App. 3d at 104.) As a result, the trial court in *Thomp-*

*son* had the authority to vacate the new trial order and reinstate defendants' convictions.

Also standing for the proposition that the *final* judgment in a criminal case is the sentence is *People v. Griffin* (1977), 56 Ill. App. 3d 255, 371 N.E.2d 1160. As recently as this year, in *People v. Mink* (1990), 141 Ill. 2d 163, 171, 565 N.E.2d 975, the Illinois Supreme Court observed that an order granting a defendant a new trial is interlocutory in nature and a court retains jurisdiction over such a defendant. In this case, it is clear that sentencing had not occurred, and under the authority of *Thompson* and *Mink*, notwithstanding defendant's reliance on foreign authority, we hold that the trial court had the authority to vacate the new trial order and reinstate defendant's conviction.

The next issue we address is whether the trial court abused its discretion by reinstating defendant's conviction after vacating its order granting defendant a new trial.

■ Defendant's argument on this issue concedes that the trial court had authority to vacate the new trial order and reinstate the conviction, but contends that under the facts of this case, the trial court abused its discretion in doing so. In so arguing, defendant again implicates constitutional guarantees, yet again relies on no case law or other authority discussing either the Federal or State constitution with regard to this issue. In making this contention, defendant's argument essentially amounts to the claim that it is unfair to have allowed defendant to remain in a "state of limbo" after conviction but before appeal.

It was in April of 1989 that the new trial was initially ordered. The State filed its motion to vacate the new trial order in October of 1989—a period of some six months. The parties have not discussed whether the new trial had received a date certain. The State's motion followed closely upon the heels of the *Chevalier* decision. In the absence of an argument relying on specific instances of prejudice to defendant, it is hard to see why the trial court abused its discretion in allowing the State's motion and reinstating the case. Assuming the trial court had correct grounds for doing so (which will be discussed), the State's argument on this issue that judicial economy is better served by the allowance of such a motion is a factor that deserves consideration. In *Thompson*, the vacature of the new trial order and reinstatement of convictions occurred more than three months after the granting of the new trials, and there was no hint that the time period was excessively prejudicial. Accordingly, we reject defendant's argument on this issue.

The third issue we address is whether defendant was denied a fair trial by the jury receiving the erroneous manslaughter instruction.

The parties do not dispute that the manslaughter instruction which the jury received was improper under *Reddick*. Defendant's argument on this issue amounts to an appeal that we reject the *Chevalier* decision in the context of a mentally ill defendant, thus entitling defendant to a new trial with a proper instruction on voluntary manslaughter.

In *Chevalier*, the court reaffirmed the long-standing rule of law that mere words are not sufficient provocation for voluntary manslaughter, regardless of how insulting or aggravating the words are. (*Chevalier*, 131 Ill. 2d at 71-72.) More specifically, the court held that a "verbal communication that adultery has occurred or will occur falls within the rule that mere words are insufficient provocation." (131 Ill. 2d at 72.) In so holding, the court observed that a number of cases which eroded at this rule in the revelations of adultery/marital discord context represented "an incorrect statement of Illinois law." (131 Ill. 2d at 75-76.) Defendant argues that we should not apply *Chevalier* "retroactively," as he relied on these cases. In fact, the record reveals that defendant did not request the instruction on voluntary manslaughter initially, but rather that the trial court decided to give the instruction, over State objection. Also, defense counsel did not argue to the jury that the jury should rely on the manslaughter instruction, but rather insisted that defendant's theory of the case was insanity. *Chevalier*, in our opinion, represents a clarification of the law rather than "new" law. The facts of this case are well within the *Chevalier* holding, and *Chevalier* compels the result that defendant was not entitled to the voluntary instruction in the first instance, and thus could not have been prejudiced by an erroneous voluntary instruction.

Defendant argues, relying not on Illinois authority but on foreign authority, that we should not apply *Chevalier* to a defendant who has been found mentally ill, and that we should apply a "subjective," as opposed to or in addition to an "objective," standard to the determination of whether a voluntary manslaughter instruction should be given. The law in Illinois, however, requires that the provocation must be sufficiently serious to incite intense passion on the part of a *reasonable person*. (See *People v. Hood* (1989), 191 Ill. App. 3d 129, 547 N.E.2d 637.) For the foregoing reasons, we decline to change the law in this respect by imposing a subjective standard on whether provocation is sufficient to entitle a defendant in Illinois to a voluntary manslaughter instruction.

Next, we address whether defendant was deprived of his right to a fair and impartial jury due to the trial court's refusal to allow the jury to examine police reports which had not been entered into evidence.

■ Defendant argues that the police reports, which related to incidences of domestic violence prior to the occurrence, should have been sent to the jury when the jury asked for them during deliberations. While these reports, which were used during the testimony of both witness-doctors, were marked as State exhibits, and were referred to by both parties during closing argument, they were not introduced into evidence. Defendant on his part never made a request that they be put into evidence. Defendant thus ascribes as error the trial court's failure to send the reports to the jury room even though defendant had not argued that they should be introduced as evidence—an occurrence which defendant says is a "technicality" that "should not have ended [the trial court's] consideration of the matter." The record, moreover, reveals no objection on the part of defense counsel to the prosecutor's reference to the nonadmitted reports during closing argument, a single reference which was only inferential in nature. Defendant, the record reveals, referred to the nonadmitted police reports in argument, as well. In making his argument on this issue, defendant relies on cases which are distinguishable as they involve questions of whether previously and properly introduced evidence should have gone to the jury.

Completely absent from defendant's argument on this issue is any rationale under which the reports themselves could have been admitted as substantive evidence. Section 115—5(c)(2) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 115—5(c)(2)) would mandate the general inadmissibility of the reports. (See also 134 Ill. 2d R. 236(b); *Moore v. Daydif* (1955), 7 Ill. App. 2d 534, 130 N.E.2d 119.) Defendant not only failed to move for the introduction into evidence of the reports, but did not lay a foundation for the reports themselves to be admitted into evidence. Despite defendant's references to Federal Rule of Evidence 703, defendant's doctor testified that he did not use the reports in forming his opinion. The record reveals that defendant's purpose in seeking to have the reports sent to the jury, and the purpose of defendant's references to the reports during his doctor's testimony, was to have the jury know that the reports indicated that defendant had mental problems or illness. In short, defendant wanted the jury to accept the truth of the matter asserted. Defendant did not argue an exception to the hearsay rule below, nor does he argue a hearsay exception in his brief. Assuming, *arguendo*, that the reports were ad-

missible in the first place, the fact remains that defendant never sought to have them admitted into evidence. We refuse to create a rule whereby either the State or defendant can have evidence sent to the jury during deliberations when the evidence has not been introduced into evidence during trial. Any other resolution of the issue would lead to the encouragement of confusing procedures at the trial level.

The next issue is whether defendant's conviction must be reversed due to the seizure of prejudicial evidence during the warrantless search of defendant's home—particularly the introduction into evidence of photographs of the victim's body and the playing of the videotape of the scene.

The initial issue the parties focus on is whether defendant has the necessary standing to argue that his rights were violated during an illegal, warrantless search of the residence and by the "seizure" of evidence during this search. An important point that the parties agree upon is that the initial entry and cursory check of the premises were legal and proper due to the recent confession on the part of defendant. Due to the manner in which we resolve this issue, we will assume that defendant has the requisite standing.

The record reveals that defendant filed a "Motion to Suppress Evidence" on September 17, 1987. Defendant moved the court to "suppress certain evidence unlawfully seized" and specified only that this evidence consisted of "certain papers, property, statements and/or evidence which might tend to incriminate" defendant. The motion argued that the seizure was constitutionally infirm because it was made without warrant or authority, no consent was given, and the seizure did not occur incident to a lawful arrest. As can be seen, the motion did not specify that any specific property be suppressed, but rather sought to suppress all evidence seized.

The evidence which defendant claims is prejudicial to him includes a videotape made by police personnel and photographs of the victim, both of these items being introduced into evidence. Defendant also appears to include in his argument claimed prejudice from testimony relating to the presence of several guns on the premises. The guns were not introduced into evidence, and any error from the description of them on the premises, which was included in the videotape of the scene, seems to have been cured by defendant's testimony suggesting that they were part of a collection. Defendant, in fact, testified that his wife had threatened him with a gun from his collection. The record reveals no testimony or argument insinuating that the presence of the guns was indicative of criminal activity on the part of

defendant. We therefore hold that any error in the reference to the guns was sufficiently minimal and cured so as not to require reversal.

■ As to the photographs of the victim's body, the State correctly observes that the Illinois Supreme Court has stated that the taking of a photograph does not amount to a seizure. (See *People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171.) The body clearly was in plain view of a justifiable entry, and defendant has not cited a case indicating that photographs of the victim cannot be entered into evidence and shown to the jury. Nor has defendant cited a case which would indicate that the trial court abused its discretion in allowing the introduction of the photographs in this case. *People v. Matteo* (1985), 127 Misc. 2d 112, 485 N.Y.S.2d 446, upon which defendant relies, is distinguishable in that that case involved photographs taken during the search of premises supported by warrant, only the warrant's affidavit did not so authorize. Here, there was a valid entry to the residence and the body was clearly in plain view.

■ As to the videotape of the scene, while we have reservations as to the use of the video in this case, it is hard to see how any prejudice to defendant occurred. The testimony accompanying the presentation of the video was all testimony which could have occurred absent the playing of the video. The testimony defendant complains of involved the absence of signals of a struggle, the fact that none of defendant's brand of cigarettes were in an ashtray, the presence of a warm cup of coffee, and the seizure of papers. In the absence of any demonstrated prejudice to defendant, we hold that no reversible error occurred in the taking of and presentation of the video.

The next issue to be resolved is whether there was insufficient evidence upon which a finding of sanity could have been made by the jury. A person is not criminally responsible for his conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1987, ch. 38, par. 6—2.) The law presumes that people are sane, and the burden of proving the defense of insanity by a preponderance of the evidence is on the defendant. (*People v. Bouchard* (1989), 180 Ill. App. 3d 26, 33, 535 N.E.2d 1001.) As the court observed in *People v. Williams* (1990), 201 Ill. App. 3d 207, 216, 558 N.E.2d 1258:

> "If the opinions of the expert witnesses on the issue of insanity conflict, the trier of fact may accept one expert's opinion over another. [Citations.] The weight to be given an expert's opinion depends upon the reasoning and factual details used to support that opinion. [Citations.]"

Further, the jury may reject all expert testimony and conclude that defendant was sane based solely on lay testimony (see *People v. Bouchard*, 180 Ill. App. 3d 26), and lay observations are especially relevant on the issue of defendant's sanity if they are based on observations made shortly before or after the crime was committed. *People v. Williams*, 201 Ill. App. 3d at 219.

■ In this case, the testimony of the experts was clearly in conflict as to defendant's sanity. Defendant argues that his expert, Dr. Abrams, knew defendant much better, both before and after the commission of the crime, and spent more time with defendant, given that defendant's expert was defendant's treating psychologist. As the State points out, however, the fact that defendant's expert knew defendant personally, as evidenced by the fact that Dr. Abrams had defendant do some work at Abrams' house after the crime, could cut either way with the jury. Defendant has not undermined the qualifications or credibility of the State's expert, Dr. Kaplan. Moreover, there was substantial testimony from the testifying officers that defendant appeared normal shortly after the crime. A consideration of the above leads us to the conclusion that it was not unreasonable for the jury to conclude that defendant failed to prove the defense of insanity by a preponderance of the evidence. Accordingly, we refuse to overturn the jury's finding on this factual issue.

■ Defendant has also requested that we reexamine the constitutionality of section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 6—2). This we refuse to do in light of the settled precedent establishing the constitutionality of the statute. See *People v. McDarrah* (1988), 175 Ill. App. 3d 284, 529 N.E.2d 808; *People v. Hightower* (1988), 172 Ill. App. 3d 678, 526 N.E.2d 1129; *People v. Martin* (1988), 166 Ill. App. 3d 428, 519 N.E.2d 1085.

■ Defendant also argues that he was denied his right to present a defense, equal protection of the law and due process of the law by the trial court instructing the jury on guilty but mentally ill. Again with respect to this argument, defendant acknowledges that settled precedent has upheld the constitutionality of the "guilty but mentally ill" statute (see *People v. Smith* (1984), 124 Ill. App. 3d 805, 465 N.E.2d 101; *People v. Carter* (1985), 135 Ill. App. 3d 403, 481 N.E.2d 1012; *People v. Seaman* (1990), 203 Ill. App. 3d 871, 561 N.E.2d 188).

■ Last, defendant raises the issue of whether his conviction must be reversed due to the cumulative errors which occurred at trial. Given our resolution that few errors occurred at trial, and given the

lack of prejudice resulting therefrom, we hold that the doctrine of cumulative error does not apply to this case.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

EGAN and LaPORTA, JJ., concur.