DEBRA L. BACHMAN, as Mother and Legal Guardian of the Estate and Person of Danielle L. Bachman, a Disabled Person, *et al.*, Plaintiffs-Appellants, v. GENERAL MOTORS CORPORATION *et al.*, Defendants-Appellees.

Fourth District No. 4—01—0237

Argued April 23, 2002.—Opinion filed July 29, 2002.

William T. Cacciatore (argued) and Eileen J. McCabe, both of Rockford, for appellants.

David M. Heilbron, Frank M. Hinman, Monty Agarwal, and Christina M. Wheeler, all of McCutchen, Doyle, Brown & Enersen, L.L.P., of San Francisco, California, and Joseph E. O'Neil (argued), Francis J. Grey, Jr., and Jennifer M. Brooks, all of Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray, of Philadelphia, Pennsylvania, for appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

In December 2000, plaintiffs, Debra L. Bachman and Danielle L. Bachman, filed a third-amended complaint against defendants, General Motors Corporation (General Motors), Uftring Chevrolet-Oldsmobile, Inc. (Uftring), Delphi Automotive Systems (Delphi), and Delco Electronic Systems (Delco), seeking to recover for injuries Danielle sustained when her 1996 Chevrolet Cavalier collided with an oncoming 1984 Ford one-ton delivery van (step van). Plaintiffs alleged that the Cavalier's supplemental inflatable restraint system (air bag) inadvertently deployed prior to the collision, thus causing the collision. Later that same month, following a jury trial, the jury returned a verdict in favor of defendants and against plaintiffs.

Plaintiffs appeal, arguing that (1) the trial court erred by (a) allowing evidence regarding data downloaded from the Cavalier's sensing and diagnostic module (SDM or SDM-R) (the air-bag crash sensor) and admitting related opinion testimony, (b) striking the causation opinion of one of plaintiffs' expert witnesses, (c) limiting the testimony of certain witnesses involved in allegedly similar occurrences, (d) allowing evidence regarding data downloaded from the SDMs of the vehicles that were driven by the "similar occurrence" witnesses, (e)

denying plaintiffs' motion to bar defendants' opinion witnesses based on alleged discovery violations, (f) permitting the jury to view Danielle's damaged Cavalier during defendants' case in chief, (g) allowing one of defendants' witnesses to testify about the dangerousness of the curve where Danielle's collision occurred, (h) allowing evidence regarding Danielle's seat belt use and the condition of her seat belt following the collision, (i) submitting a special interrogatory to the jury, and (j) denying plaintiffs' motion to amend their complaint to add a punitive damages prayer, pursuant to section 2—604.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2—604.1 (West 1996)); (2) the jury's verdict was against the manifest weight of the evidence; and (3) the trial court's cumulative errors denied plaintiffs a fair trial. We affirm.

## I. BACKGROUND

In late October 1996, Danielle purchased a new 1996 Cavalier from Uftring. On the morning of November 6, 1996, Danielle was driving her Cavalier north on Nofsinger Road in Woodford County. At around 7:45 a.m., Danielle lost control of the car and collided with an oncoming step van. As a result of the collision, Danielle sustained very serious and permanently disabling injuries.

In June 1998, plaintiffs sued defendants (as well as other entities that are no longer parties to this action) for injuries Danielle sustained in the collision. In December 2000, plaintiffs filed a third-amended complaint, alleging as follows: (1) the air bag in Danielle's Cavalier, which was sold by General Motors through its authorized dealer, Uftring, was defective in that it inadvertently deployed because its SDM (which was designed and manufactured by Delphi and Delco) was "hypersensitive" to road surfaces and objects striking the Cavalier's floor pan; (2) General Motors, alone and by and through Uftring, failed to warn consumers about defective air bags in 1996 Cavaliers; (3) negligence on the part of General Motors and Uftring; (4) Delphi and Delco failed to warn consumers about the defective air bags in 1996 Cavaliers; and (5) negligence on the part of Delphi and Delco.

### A. *Frye* Hearing

In September 2000, plaintiffs filed a motion *in limine*, seeking to bar defendants from presenting evidence regarding data downloaded from the SDM in Danielle's Cavalier. In October 2000, defendants filed a supplemental response to plaintiffs' motion, requesting a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) to determine the admissibility of the SDM evidence. The trial court granted defendants' request, and the evidence at the November 2000 hearing showed the following.

Douglas Nunan, a senior project engineer in Delphi's restraint systems electronics group, testified that between August 1989 and May 1996, he was responsible for designing and developing SDMs, including the type of SDM installed in Danielle's Cavalier. Crash sensing devices like the SDM are commonly used throughout the automobile industry. The SDM, which is controlled by a microprocessor, has multiple functions: (1) it determines if a severe enough impact has occurred to warrant deployment of the air bag; (2) it monitors the air bag's components; and (3) it permanently records information. The SDM contains software that analyzes the longitudinal deceleration of a vehicle to determine whether a deployment event has occurred "based on testing that was done previously to determine what events would require protection by an air bag." When the SDM senses an event (either a deployment event or an event that is not severe enough to require an air bag—that is, a near-deployment event), that information is recorded to the microprocessor's electrically erasable programmable read-only memory (EEPROM). (When the air bag is deployed, the SDM records the event as a "Code 51.") Nunan explained that by recording data, "you have a record to go back and look to see, did the result that came out match what you should have had." Although certain diagnostic codes stored in the EEPROM could be erased, the SDM installed in the Cavalier "was specifically designed to prevent" air-bag deployment data from being altered or erased.

Based on crash test data, Nunan opined that the type of SDM installed in Danielle's Cavalier accurately and reliably recorded data. Because SDM data is stored in hexadecimal format, it must ordinarily be converted to a decimal format before it can be analyzed. (A hexadecimal system is a numbering system that has 16 characters; that system employs the letters A through F, in addition to the numbers zero through nine, which are used in the decimal system.) A competent engineer could convert and read the data using a basic calculator and General Motors documents. In mid-2000, a publicly available crash data retrieval tool (Vetronix equipment) was updated with new software to allow anyone with a Windows-based computer to download SDM data in an easy-to-read format. Based on Nunan's experience, engineers at the National Highway Traffic Safety Administration (NHTSA), as well as automobile manufacturing engineers, rely upon data that is recorded and stored by SDM-type devices. He opined that deployment and crash event data recorded by the SDM is generally accepted as reliable and accurate by the automobile industry and the NHTSA.

Nunan also stated that a power loss during a crash would not affect data previously recorded. Therefore, the fact that Danielle's

Cavalier lost electrical power during the collision did not affect the reliability or accuracy of the data recorded by the SDM. Due to the Cavalier's loss of electrical power, an external power source was used to retrieve data from the SDM in August 1997. According to Nunan, such a procedure is normal and does not affect the accuracy of the SDM's data. Nunan further stated that the newly updated Vetronix equipment could be used to retrieve data from Danielle's Cavalier, and that data would be identical to the data originally retrieved. He acknowledged that the SDM's performance specifications were not public knowledge. He also acknowledged that at the time of the collision, crash data recorders in vehicles were not standardized.

Nunan further testified that General Motors began receiving reports in 1996 indicating that air bags in some Cavaliers and other "J-cars" inadvertently deployed when small road objects hit a specific area under the car and the SDM's microprocessor incorrectly interpreted the incident as a deployment event. (J-cars included Cavaliers and Pontiac Sunfires.) General Motors' investigation of those inadvertent, non-crash deployments reconfirmed the reliability of the SDM's data-recording capabilities. Nunan explained that the eventual recall involved repairing the SDMs by recalibrating the software to create a higher threshold for air-bag deployment. However, that recalibration did not have anything to do with the SDM's data-recording function or the reliability of its recorded data. He also stated that in the reported inadvertent, non-crash deployment events, the SDMs recorded only a small change in velocity (delta-v or delta-velocity) or deceleration of the vehicles.

John Sprague, a Delphi systems engineer who worked at General Motors in Warren, Michigan, testified that from 1993 through 1996, he was a sensing application engineer for several vehicles, including the 1996 Cavalier. He conducted development testing of the SDM and investigated actual field deployments. The SDM on the 1996 Cavalier was designed to sense longitudinal deceleration of the vehicle. A competent and knowledgeable engineer could convert and read the SDM data using General Motors documents and a basic calculator. He acknowledged that the 1996 Cavalier SDM's product definition documents were "generally treated as confidential" by General Motors.

Sprague also stated that he was involved in the investigation of the inadvertent-deployment cases. That investigation included downloading and reading data from (1) SDMs involved in the inadvertent deployments and (2) SDMs in vehicles used to replicate the actual inadvertent deployments. That data showed a relatively low delta-v, ranging from one to three miles per hour. The investigation also showed that when the vehicle's floor pan was hit in a particular man-

ner, it caused a high frequency resonance that the SDM interpreted as a deployment event. The SDM's microprocessor correctly measured and performed calculations with the input signal, and using a deployment logic algorithm, the SDM compared the calculated values to calibration parameters programmed into the SDM. The SDM accurately recorded the delta-v as calculated by the SDM's microprocessor. However, the SDM made a decision to deploy the air bag when it was not actually needed.

Sprague opined that neither the defect nor the recall had anything to do with the SDM's recording function, the retrieval of data from the SDM, or the reliability of its recorded data. General Motors submitted information regarding the investigation to the NHTSA, which must approve the determination and proposed correction of an automobile defect. According to Sprague, no one from NHTSA ever questioned the reliability or accuracy of the data being downloaded from the 1996 J-cars. Based upon his development testing of the SDM and his investigation of the inadvertent-deployment events, Sprague opined that the SDM's recording function was both reliable and accurate.

Sprague further testified that the data retrieved from Danielle's Cavalier showed a delta-v of 16.2 miles per hour, which was above the air-bag deployment threshold and consistent with a crash event. He opined that the data retrieved from Danielle's Cavalier was not consistent with the data retrieved from the vehicles involved in the inadvertent-deployment events.

The trial court also considered several affidavits and documents submitted by the parties. Donald Floyd, a former supervisor of diagnostic software activities at General Motors, averred that he was responsible for releasing data to Vetronix for its use in developing a crash retrieval system for General Motors cars. The Vetronix equipment allows anyone with a computer equipped with Windows 95 or 98 to download data recorded by SDMs on General Motors vehicles. Floyd participated in testing with Vetronix, the Insurance Institute for Highway Safety, and Canadian law enforcement, in which the accuracy of downloaded SDM data was confirmed.

Daniel Faust, a General Motors staff development engineer, averred that the NHTSA and the National Transportation Safety Board (NTSB) have requested other downloaded SDM collision data from General Motors. Keith Schultz, a General Motors senior staff engineer, averred that other government and law enforcement agencies also request and rely on SDM collision data downloaded by General Motors engineers. Schultz and NHTSA representatives coauthored an article entitled "Recording Automotive Crash Event

Data," in which they (1) concluded that the loss of electrical power during a crash did not affect the reliability or accuracy of data retrieved from the SDM and (2) suggested traffic safety uses for the SDM data.

After considering the evidence and counsel's arguments, the trial court denied plaintiffs' motion *in limine*, upon determining that the data downloaded from the SDM in Danielle's Cavalier and opinions regarding that data were admissible at trial under both (1) the *Frye* standard (*Frye*, 293 F. at 1014); and (2) the "*Frye*-plus-reliability" standard set forth by this court in *Harris v. Cropmate Co.*, 302 Ill. App. 3d 364, 368-75, 706 N.E.2d 55, 60-65 (1999).

## B. The Trial

At the November and December 2000 jury trial, Danielle testified that on October 28, 1996, she purchased a 1996 Cavalier from Uftring. When Danielle, who is 5 feet tall, drove her car, her seat was positioned close to the steering wheel, in an upright position. Around 7:15 a.m. on November 6, 1996, she left her house and drove toward Wesley Schalk's house on Nofsinger Road. About one-half mile from Schalk's house, the road had a rough section leading into a curve. That morning, she was driving between 35 and 40 miles per hour on that section of road when "out of the blue [her] air bag unexpectedly deployed." The air bag knocked her hands off the steering wheel, hit her head, and rendered her unconscious, causing her to lose control of her car. She did not remember anything else about the collision.

Danielle also testified that prior to the collision, neither Uftring nor General Motors warned her that a greater risk of inadvertent air-bag deployment existed in 1996 Cavaliers. She acknowledged that during her discovery deposition, she testified that after the air bag deployed, she tried to unbuckle her seat belt and jump out of her car.

James Reed testified that around 8 a.m. on November 6, 1996, he was driving a 1984 Ford one-ton step van south on Nofsinger Road, which is a two-lane, tar and chip road. According to Reed, no loose gravel was on the road. As he was driving around a curve, Danielle's car "started crossing the line" and coming toward him. He acknowledged that during his deposition, he testified that Danielle was traveling too fast for the curve she was approaching. According to Reed, "[i]t looked like she might have gotten control of [her car] and hit the dirt and then she [came] at [him] sidewise." Reed put on his brakes, steered toward the right, and was almost completely stopped when the front driver's side of Danielle's car hit his step van. Danielle's car did not slow down significantly prior to the collision. Reed did not see smoke inside Danielle's car as it was coming toward him, nor did he

see anything inside her car at the time of the collision. Following the collision, Reed entered the passenger's side of Danielle's car and noticed that the driver's-side air bag had deployed.

Richard A. Schneider, an Uftring auto body technician, testified that on the morning of November 6, 1996, he was driving behind Reed on Nofsinger Road. Nofsinger Road is "a blacktop surface road that proceeds straight for some time, and *** has a series of gradual S-curves with a dip in the area where the accident occurred." The road has several bumps south of the collision scene; however, those bumps had never affected Schneider's ability to control his car when driving between 35 and 50 miles per hour. When he first noticed Danielle's car, she was traveling north around a curve on Nofsinger Road. Schneider estimated that Danielle was going "significantly more" than the posted 35-mile-per-hour speed limit. Schneider saw Danielle's car fishtail to the left, with the back end of her car crossing the centerline into the southbound lane, then back to the right, and then back to the left again. At the time of the collision, the front of Danielle's car was pointing in a northeastern direction. According to Schneider, the left front portion of Reed's step van collided with the "rear of the left front fender" and the left rear quarter panel of Danielle's car. He acknowledged that during his discovery deposition, he testified that Reed's step van hit Danielle's car at a right angle. At the time of the collision, Schneider did not see smoke inside Danielle's car or the air bags deploy. As he approached Danielle's car following the collision, he smelled the odor of deployed air bags and saw that both air bags had deployed and Danielle was wearing a seat belt.

Daniel Law, an Illinois State Police sergeant, testified that at around 7:50 a.m. on November 6, 1996, he arrived at the scene of the collision. After observing Danielle, Law requested Life Flight, an emergency helicopter. He noted that the surface of Nofsinger Road was dry that morning. Based on Law's background as an accident investigator and his inspection of the scene, he concluded that Danielle's speed was a contributing cause of the collision. Law acknowledged that he did not calculate Danielle's speed at the moment of the collision.

William Gray, Jr., testified that at the time of the collision, he had lived on Nofsinger Road for about eight years and had driven on the road many times. Approximately 300 feet south of the collision site, the road's surface was "wavy [and] ripply." When he drove over that section of the road, his vehicle bounced and vibrated "a little bit." William stated that on the morning of November 6, 1996, Nofsinger Road was damp.

Ricki Gray testified that at the time of the collision, she had lived

on Nofsinger Road for about seven years. When driving her car around the curve near the "rippled" section of the road, it gave her the "feeling that [she] want[ed] to lose control."

Several physicians, including Dr. Ronald Meyer, Danielle's treating physician, Dr. Panna Goswami, a rehabilitation physician, and Dr. Jai Kumar, a neurologist, testified about Danielle's various injuries and their treatment of her following the accident.

John Sonye, Jr., General Motors' director of product investigations for North America, testified as an adverse witness that he participated in field performance evaluations of General Motors products. He participated in the investigation into claims of inadvertent air-bag deployments in 1996 and 1997 J-cars (referred to as the "1241 investigation"). Based upon that investigation, General Motors recalibrated the air-bag software to create a higher threshold for air-bag deployment. Sonye also stated that when the SDM commands an air-bag deployment, it records the event as a Code 51. In some of the 1996 and 1997 Cavaliers that Sonye investigated, the SDM showed a Code 51 although no crash had occurred, which meant that the air bag had inadvertently deployed.

Sonye then identified plaintiffs' exhibit No. 7, an August 1998 recall letter from General Motors to its customers, which stated that (1) "General Motors [had] decided there [was] a defect related to motor vehicle safety in 1996 and some 1997 Chevrolet model vehicles"; and (2) "[b]ecause of certain calibrations in the air bag's computer, there [was] an increased risk of an air[-]bag deployment in a low speed crash or when an object strikes the floor pan." He acknowledged that the recall letter, which was the only notice sent to customers, also advised customers that their Chevrolet dealers would reprogram their SDMs at no charge to reduce the possibility of inadvertent deployments. He also identified plaintiffs' exhibit No. 28, an August 1998 product recall campaign bulletin, which stated that General Motors had determined that a defect "related to motor vehicle safety" existed.

Sonye further testified that the 1241 investigation, which was in its "infancy stage" in November 1996, ultimately showed that when the Cavalier's floor pan was hit in a particular manner with a force equivalent to a three- to five-ounce hammer, it caused an air-bag deployment. In those instances, the data recorded by the SDM showed a delta-v of less than five miles per hour, which "was clearly below the threshold at which it should have deployed." Sonye further stated that the data retrieved from the SDMs was reliable and was used to identify the inadvertent-deployment problem. He explained that the SDM accurately recorded data; however, it incorrectly interpreted that data as a crash. Once data is recorded by the SDM, it cannot be altered

or erased, and a power loss during a crash would not affect data previously recorded.

Sprague testified as an adverse witness that Delphi designed and manufactured the SDM that was installed in 1996 and 1997 Cavaliers. He participated in the 1241 investigation, which showed that the inadvertent air-bag deployments occurred following short-duration events with "relatively flat low [delta velocities] with little or no damage to the vehicles." The delta-v in the inadvertent air-bag deployments ranged from one to three miles per hour. Based on the 1241 investigation, the investigators changed the SDM's sensing calibration to increase the air-bag-deployment threshold. Sprague acknowledged that between October 1995 and August 1998, General Motors received approximately 200 complaints of inadvertent air-bag deployments. Around 24 complaints were filed prior to November 6, 1996.

Brian Everest, a General Motors product analyst, testified as an adverse witness that he analyzed the performance of air bags during crashes involving General Motors vehicles. He participated in the August 4, 1997, joint inspection of Danielle's Cavalier. Everest visually inspected Danielle's car, but he did not inspect the car's undercarriage. He also downloaded data from the SDM using an event data retrieval unit (EDRU) that interfaces either with a vehicle's data link connector or directly to the SDM. Everest acknowledged that a person must receive some training to download data from an SDM. A copy of the downloaded data was provided to plaintiffs' attorney and their engineering expert. The SDM detects whether a vehicle's air bags should deploy, monitors the air bag's components, and permanently records information. The download from Danielle's SDM revealed only 160 to 170 milliseconds of data, although the SDM was capable of recording up to 300 milliseconds. Everest stated that a power loss likely caused the SDM to record only 160 to 170 milliseconds of data. He did not know what caused the power loss in Danielle's car.

Keith Schultz, a senior staff engineer for General Motors' product investigations department, testified as an adverse witness that his department's primary role is to communicate with the federal government regarding problems with General Motors products. He stated that the tool that was used to download data from the SDM was not publicly available in 1996. At that time, a person would need certain General Motors documents to interpret the downloaded data. However, once provided with the proper documents, a competent engineer could interpret data downloaded from the SDM. General Motors provided the proper documents to plaintiffs' attorney and experts in this case. Sometime in 2000, a crash data retrieval tool that was designed to download and interpret SDM data was made available to the public.

Dennis McConnell, a General Motors customer assistance manager, testified that he assisted in the 1241 investigation. He identified plaintiffs' exhibit No. 68 as an August 22, 1996, customer complaint regarding a 1996 J-car's air bag that had deployed "with no impact." McConnell also identified plaintiffs' exhibit No. 67 as an October 30, 1995, customer complaint regarding a 1996 Cavalier's air bag that had deployed without impact. He stated that such customer complaints were kept in the regular course of business.

Douglas Page, a mechanical engineer, testified as plaintiffs' expert witness that he had almost 35 years' experience in the aerospace industry, including work with the F-5 fighter plane and developing certain devices for the Gemini and Apollo space programs. Page acknowledged that he had never worked in the automobile industry or designed any type of air bag or SDM. Page did not have experience testing a recording system like the one on the SDM or retrieving crash event data from an automobile. However, he stated that based on his work in the aerospace industry, he understood the general principles of air-bag deployment. On August 4, 1997, Page conducted a joint inspection of Danielle's Cavalier, along with some General Motors inspectors. Page identified certain photographs, which showed damage to Danielle's car "from just behind the front wheel" on the driver's side to the rear left wheel. Following the visual inspection, the General Motors inspectors removed the SDM and downloaded its recorded data.

Page also testified that he reviewed several items in formulating his opinions, including the following: (1) a printout of the downloaded data from the SDM removed from Danielle's Cavalier; (2) excerpts from the Cavalier's owner's manual and service manual regarding its air-bag system; (3) a videotape showing the accident scene and Reed's step van; (4) photographs of the step van; (5) correspondence between NHTSA and Sonye; (6) a "near deployment file worksheet"; (7) a copy of the accident report; (8) several discovery depositions; and (9) certain General Motors and NHTSA documents.

Based on his review of those items, Page opined that the SDMs installed in 1996 and some 1997 Cavaliers (1) were defective because they had an increased risk of inadvertent deployment and (2) had inadvertently deployed in over 200 cases. He also opined that the air bag in Danielle's Cavalier "inadvertently deployed primarily due to design faults in the system." He based that opinion on (1) "an accumulation of information from throughout the General Motors documents"; (2) Danielle's deposition testimony that the air bag inadvertently deployed; (3) Schneider's deposition testimony that he never saw Danielle's air bag deploy; and (4) Reed's deposition testimony that he

saw Danielle's car fishtailing prior to the collision. Page also stated that the condition of Nofsinger Road (specifically, the bumpy, "washboard" section and loose pebbles) could have caused the inadvertent deployment of Danielle's air bag.

Page also opined that the air bag in Danielle's Cavalier was not designed to deploy on a side impact. He based that opinion on his review of (1) Cavalier's owner's and service manuals, and (2) deposition testimony. Page explained that the service manual stated that the air bag was designed to deploy when the car was involved in a "frontal crash up to 30 degrees off the center[ ]line of the vehicle." He further opined that the collision involved a "t-bone" side impact to Danielle's Cavalier, basing that opinion on his review of the photographs of her car following the collision. Page acknowledged that his opinion in this regard was "at odds" with plaintiffs' accident reconstruction expert, who opined that Reed's step van hit Danielle's car at a 43-degree angle.

Page additionally opined that the data downloaded from the SDM in Danielle's car (1) was in a hexadecimal code, which was confidential and known only to General Motors, Delco, or Delphi, and (2) was not accurate or reliable. He stated that the algorithms and formulas were proprietary to General Motors and not subject to examination by him. He also stated that the SDM "can be lied to" by its sensors. Although the SDM can record 300 milliseconds of data, the printout from Danielle's SDM contained only 170 milliseconds of data.

Page acknowledged that he did not know exactly what caused Danielle's air bag to deploy. He also acknowledged that he did not inspect the site of the collision or Reed's step van. Page further stated that the SDM from Danielle's Cavalier recorded a longitudinal deceleration during the November 6, 1996, incident. The data downloaded from that SDM showed a delta-v of over 16 miles per hour, which exceeded the level at which the air bag was designed to deploy. The SDM recorded only one deployment event during the time Danielle was driving the Cavalier on the morning of November 6, 1996. Page additionally acknowledged that he did not rely on the data downloaded from the SDM in Danielle's car because he never attempted to interpret the data and "[i]t was meaningless to [him]." Nor had he compared the data downloaded from Danielle's SDM with the data downloaded from the Cavaliers that were part of the 1241 investigation. Page also conceded that he could not say that the SDM was inaccurate.

Ronald L. Van Daele, plaintiffs' accident reconstruction expert, testified that "[t]he contact damage on the Cavalier [began] at the rear of the front left wheel, wheel well, and continue[ed] rearward,

including the driver's door, the left side of the windshield, left side of the roof, the rear left quarter panel and ending in the center of the rear left wheel well." Van Daele opined that based on his reconstruction of the accident, Reed's step van hit Danielle's car at a 43-degree angle. He stated that the impact constituted a side impact, but not a "90-degree, pure t-bone side impact." Van Daele also stated that the Cavalier's initial instability was due to the bumpy road surface. He further stated that "[t]he allegation that the air bag inadvertently deployed causing [Danielle] to be stunned appears to be reasonable." He opined that (1) "[t]he Cavalier appeared to be driven by a person who could have been stunned, but not certainly out of control"; and (2) he could think of no other cause for Danielle's lack of reaction to the approaching hazard of Reed's step van. Van Daele additionally opined that if Danielle had attempted to negotiate the curve just south of the collision scene at a high rate of speed, she would have crashed into a nearby ravine, not Reed's step van. The only role speed played in the collision was its effect on the severity of the crash.

Van Daele acknowledged that (1) the data downloaded from the SDM in Danielle's Cavalier showed a delta-v of over 16 miles per hour and (2) the Cavalier's collision with Reed's step van was the only thing that could have resulted in such a change in velocity.

Several witnesses testified that they had been driving 1996 or 1997 J-cars when the driver's side air bag inadvertently and unexpectedly deployed. Those witnesses also testified that the air bag knocked their hands off the steering wheel and created noise and smoke upon deployment.

Sharon Seckler testified for defendants that on the morning of November 6, 1996, she was in her house when she heard a crash. She walked down her driveway and saw that a Cavalier and a step van had collided. Seckler looked inside Danielle's car and noticed that Danielle was wearing a seat belt and the air bag had deployed. Seckler stated that she had lived on Nofsinger Road for almost eight years and had frequently driven through the same curve Danielle had driven through just before the collision. Based on Seckler's personal experience, if a person drives around the curve at more than 35 miles per hour, that person could lose control and cross the centerline.

Alan Thebert, a crash analysis automotive engineer, testified as defendants' accident reconstruction expert that when Reed's step van finally collided with the left rear wheel of Danielle's car, "the force between the two vehicles was almost purely front to rear." Thebert opined that Danielle was traveling at approximately 55 to 60 miles per hour as she drove through the curve approaching the collision site. He also opined that Danielle was driving 45 to 50 miles per hour when

the collision occurred. Thebert further opined that (1) Reed's step van collided with Danielle's Cavalier at a 30- to 45-degree angle; and (2) as a result of the collision, the Cavalier experienced longitudinal deceleration. He additionally opined that (1) Danielle was steering the Cavalier as she came around the curve and up to the point of the collision and (2) the collision was due to driver error and excessive speed.

Edward McKenna, a product litigation consultant, testified for defendants that in April 1999, he inspected the driver's seat belt assembly in Danielle's Cavalier. McKenna opined that (1) Danielle had worn the seat belt during the collision, (2) "the marks on the belt" and latch plate showed that Danielle moved forward and to the left during the collision, and (3) "[t]he seat belt restrain[ed] the forward motion when the longitudinal deceleration was being experienced by the car."

Nunan testified regarding the purposes, function, and accuracy of the SDM, as he did at the *Frye* hearing. He also stated that based on his review of a videotape of the downloading of the SDM data from Danielle's Cavalier, the downloading was performed properly. Nunan opined that the downloading process had no effect on the data downloaded from the SDM. The downloaded data showed that the delta-v for Danielle's Cavalier during the collision was 16.2 miles per hour, which was above the air-bag-deployment threshold of 14 miles per hour. In contrast, the data from the 1241 investigation showed that the delta-v in the inadvertent-deployment cases was one to two miles per hour.

Nunan also testified that the SDM can record two separate events in the same ignition cycle (measured each time the vehicle is started). Nunan stated that if—as plaintiffs alleged—Danielle's Cavalier experienced an inadvertent deployment prior to the collision, "there would be two records present in the SDM": (1) the inadvertent deployment; and (2) the 16.2-mile-per-hour delta-v. The SDM recorded only one event—the 16.2-mile-per-hour delta-v—during the November 6, 1996, ignition cycle. Nunan also opined that the air-bag-deployment threshold was exceeded when Danielle's Cavalier collided with Reed's step van. He further opined that (1) the loss of power to the Cavalier during the collision had no effect on the data recorded by the SDM, (2) the data downloaded from the Cavalier was inconsistent with the data downloaded from cars involved in the 1241 investigation, and (3) the air bag in Danielle's Cavalier did not inadvertently deploy.

Roger Nightingale, a biomedical engineer, testified regarding the causes of Danielle's specific injuries. He opined that the overall cause of Danielle's injuries was the "oppressive" intrusion of Reed's step van into the Cavalier.

On this evidence, the jury returned a verdict in favor of defendants and against plaintiffs. The jury also answered "no" to defendants' special interrogatory, which inquired as follows: "Did the driver's side air bag inadvertently deploy on November 6, 1996?" This appeal followed.

## II. ANALYSIS

### A. The Trial Court's Decision To Allow Evidence Regarding the Cavalier's SDM Data

Plaintiffs first argue that the trial court erred by denying their motion *in limine* to exclude evidence regarding the data downloaded from the SDM in Danielle's Cavalier and related opinion testimony. We disagree.

Initially, we note that prior to oral argument in this case, the Supreme Court of Illinois in *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 80-81, 767 N.E.2d 314, 325-26 (2002), clarified that the *Frye* standard is the standard in Illinois, not the "*Frye*-plus-reliability" standard (see *Harris*, 302 Ill. App. 3d at 368-75, 706 N.E.2d at 60-65). We thus determine whether the trial court abused its discretion by admitting SDM data and related testimony under the *Frye* standard.

"The determination of whether a party has met the *Frye* standard lies within the trial court's discretion, and a reviewing court will not reverse absent an abuse of that discretion." *First Midwest Trust Co. v. Rogers*, 296 Ill. App. 3d 416, 427, 701 N.E.2d 1107, 1114 (1998). "In determining whether there has been an abuse of discretion, [a reviewing court] may not substitute [its] judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely." *Simmons v. Garces*, 198 Ill. 2d 541, 568, 763 N.E.2d 720, 737 (2002); see also *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991) (an abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable man would take the view adopted by the trial court).

In *Donaldson*, 199 Ill. 2d at 76-78, 767 N.E.2d at 323-24, the supreme court discussed the admission of expert testimony under the *Frye* standard, stating as follows:

"Illinois law is unequivocal: the exclusive test for the admission of expert testimony is governed by the standard first expressed in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). [Citations.] The *Frye* standard, commonly called the 'general acceptance' test, dictates that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' *Frye*, 293 F. at 1014.

First, 'general acceptance' does not concern the ultimate conclusion. Rather, the proper focus of the general acceptance test is on the underlying methodology used to generate the conclusion. If the underlying method[s] used to generate an expert's opinion are reasonably relied upon by the experts in the field, the fact finder may consider the opinion—despite the novelty of the conclusion rendered by the expert. [Citations.]

Second, general acceptance of methodologies does not mean 'universal' acceptance of methodologies. *** 'In determining whether a novel scientific procedure is "generally accepted" in the scientific community, the issue is consensus versus controversy over a particular technique. *** Moreover, the mere existence of a dispute does not preclude a finding that the procedure is generally accepted.' [Citations; see] *Frye*, 293 F. at 1014 ('[J]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized'). Simply stated, general acceptance does not require that the methodology be accepted by unanimity, consensus, or even a majority of the experts. A technique, however, is not 'generally accepted' if it is experimental or of dubious validity. Thus, the *Frye* rule is meant to exclude methods new to science that undeservedly create a perception of certainty when the basis for the evidence or opinion is actually invalid."

In denying plaintiffs' motion *in limine* to exclude evidence regarding the SDM data and related opinion testimony, the trial court initially found that the process of recording SDM data was not novel, stating as follows:

"Computer data, in general, and it is the computer information being recorded, in the court's mind[,] is not novel. It is an accepted fact of society. We have floppy disks, tape backups, [Z]ip drives used by individuals and businesses alike to record and capture data. ***

The microprocessor used in the SDM-R in this case is used in many consumer products and is a standard part used in various vehicle control systems, including engine controls, anti-lock brakes, suspension controls and air bags. It is only the admissibility, under the *Frye* test, of the SDM-R data which could be, in the court's opinion, conceived as novel."

We agree with the trial court that the process of recording and downloading SDM data does not appear to constitute a novel technique or method. See American Heritage Dictionary of the English Language 898 (1975) (defining "novel" as "[s]trikingly new, unusual, or different"). Crash sensors such as the SDM have been in production in

automobiles for over a decade, and the microprocessors that run them and record their data also run everyday appliances, such as computers and televisions. See *Harris*, 302 Ill. App. 3d at 372, 706 N.E.2d at 62 ("If the scientific evidence is not 'novel,' then the *Frye* admissibility standard has been satisfied \*\*\*"); see also *State v. Russell*, 125 Wash. 2d 24, 70, 882 P.2d 747, 776 (1994) (holding that the *Frye* standard did not apply where computer programs listing various characteristics of homicides were "nothing more than sophisticated record-keeping systems").

Nonetheless, because the admissibility of SDM data is a question of first impression, we analyze its admissibility under the *Frye* standard—as did the trial court. In determining that "[t]he method of downloading data, and utilization of data recorded by the SDM" was generally accepted within the relevant scientific community, the court stated, in pertinent part, as follows:

"[T]he court refers to the scientific community or communities as being mechanical engineering and/or physics.

Is the technique or method generally accepted within that community? The defendants have offered affidavits of General Motors engineers and/or non[-General Motors] engineers, albeit engineers who are employed by the defendants.

Have any physicists, mechanical engineers[,] and/or accident reconstructionist experts scrutinized that data outside [General Motors]? According to the documents which have been submitted to the court, [two individuals with NHTSA] coauthored an article with [General Motors] employees Tom Mercer and Keith Schultz entitled 'Recording Automotive Crash Event Data' in 1999 utilizing data captured by [General Motors] vehicles within that article.

That article suggested the three uses for data stored on these devices[:] [(]1) for improving air[-]bag sensing systems[;] [(]2) improving roadway design[; and] [(]3) developing meaningful motor vehicle regulations.

In essence, that data would be utilized for research and development purposes and/or for traffic[-]safety[-]related purposes.

The SDM data, from not only this particular vehicle but other SDMs, is now available to all researchers and investigators via the system created by the Vetronix Corporation of California.

Prior to the release of the system, Vetronix verified the accuracy of the data recorded by the SDM.

The system is now being used, per the affidavit of Donald Floyd, by NHTSA, Transport Canada, Insurance Institute for Highway Safety, [and several state police departments], in addition to independent researchers and accident reconstructionists.

Per the affidavit of Daniel Faust, an employee of [General Mo-

tors], the data recorded by [General Motors] SDMs has been requested by the [NTSB].

\* \* \*

The downloaded purported data utilized in determining how to change [the] calibration in the SDM-R was used to prevent inadvertent deployment of air bags.

The loss of electrical power during a crash event does not affect the reliability or accuracy of data written to memory prior to loss of power.

That the downloaded recorded data from the SDM-R has been compared with independent instrument grade accelerometers to verify delta-velocity values and were accurate.

That the data recording function of the SDM-R is separate from the deployment function of the SDM-R.

\* \* \*

The SDM data, in addition, is currently subject to peer review via the software/hardware codeveloped with or by [General Motors] with Vetronix Corporation."

■ Reviewing the record before us under the appropriate standards, we conclude that the trial court did not abuse its discretion by (1) finding that the process of recording and downloading SDM data is sufficiently established to have gained general acceptance in the relevant scientific community, and, thus, (2) determining that the *Frye* admissibility standard had been satisfied. This process is simply not the sort of method "new to science that undeservedly create[s] a perception of certainty when the basis for the evidence or opinion is actually invalid" (*Donaldson*, 199 Ill. 2d at 78, 767 N.E.2d at 324). Accordingly, we hold that the court did not err by allowing evidence regarding data downloaded from Danielle's SDM and related opinion testimony.

In so concluding, we reject plaintiffs' contention that the trial court "erred in its finding of general acceptance within the scientific community" because (1) the SDM data is "proprietary and confidential" and "not subject to any independent testing or verification analysis," (2) "no uniformity in data recording or retrieval" exists among automobile manufacturers, and (3) NHTSA meetings to discuss uniform standards are "closed to the public." Contrary to plaintiffs' contentions, the record shows that any competent engineer could interpret the SDM data using documents General Motors produced in discovery and a calculator. Further, (1) whether the workings of General Motors SDM are kept "confidential" from competitors, (2) whether the SDM records data pursuant to uniform standards, and (3) whether NHTSA holds public meetings are not issues pertinent to

determining whether the process of recording and downloading SDM data is generally accepted by the relevant scientific community.

■ We also reject plaintiffs' contention that the trial court "erred in relying upon" defendants' affidavits. Plaintiffs have forfeited this issue on appeal by advising the court that they had no objection to the court's considering defendants' affidavits. See *Kotvan v. Kirk*, 321 Ill. App. 3d 733, 750, 747 N.E.2d 1045, 1059 (2001) (" 'Preservation of a question for review requires an appropriate objection in the court below [citation], and failure to object constitutes waiver.' *Williamsburg Village Owners' Ass'n v. Lauder Associates*, 200 Ill. App. 3d 474, 479, 558 N.E.2d 208[, 210-11] (1990)"). Further, "[i]n conducting a *Frye* evidentiary hearing (as in any hearing to determine the admissibility of opinion testimony), the trial court is not required to strictly comply with the rules of evidence" and may consider "testimony or affidavits of experts." *Harris*, 302 Ill. App. 3d at 376, 706 N.E.2d at 65.

### B. The Trial Court's Decision To Strike Page's Testimony on Causation

Plaintiffs next argue that the trial court erred by striking Page's opinion testimony that the alleged inadvertent deployment of the air bag caused Danielle to lose control of her car and crash into Reed's step van (causation opinion). Specifically, they contend that the court's striking of Page's testimony on causation "was tantamount to directing a verdict for the [d]efendants and deprived the [p]laintiffs of a fair trial in this case." We disagree.

■ In *People v. Miller*, 173 Ill. 2d 167, 186, 670 N.E.2d 721, 730 (1996), the supreme court discussed the applicable law regarding expert witnesses, stating as follows:

"Whether an individual is an expert on a particular subject is a matter generally reserved to the sound discretion of the trial court. [Citation.] An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge which is not common to laypersons, and where such testimony will aid the trier of fact in reaching its conclusions. [Citation.] An expert need only have knowledge and experience beyond that of the average citizen."

In addition, in *Kleiss v. Cassida*, 297 Ill. App. 3d 165, 174, 696 N.E.2d 1271, 1277 (1998), this court stated as follows:

"The trial court has a special responsibility as to expert witnesses. The decision whether to admit expert testimony, both whether the expert is qualified and whether his testimony will assist the trier of fact in understanding the evidence, rests within the sound discretion of the trial court."

See also *Galindo v. Riddell, Inc.*, 107 Ill. App. 3d 139, 146, 437 N.E.2d

376, 382 (1982) ("In order to qualify as an expert, it must be shown that the proposed expert possesses special skills beyond the ken of the average juror and that he employed those skills in forming an opinion").

In October 2000, defendants filed a motion *in limine*, seeking to preclude Page's testimony on the grounds that (1) Page did not possess adequate qualifications, and (2) his opinions were not "supported by reliable analysis." Following a November 2000 hearing, the trial court denied that motion. Defendants renewed their motion immediately prior to Page's direct testimony, arguing that Page "ignore[d] the SDM data, [and had] only three bases for his opinions," the deposition testimony of Danielle, Schneider, and Reed. The court noted for the record that defendants had made their objections and reaffirmed its prior ruling.

During his direct testimony, Page opined that the inadvertent deployment of the air bag in Danielle's Cavalier caused her to lose control of the car and crash into Reed's step van. When plaintiffs' counsel asked Page the basis for his causation opinion, he stated, "Well, once again, I have to go back to the three witnesses that have given deposition[s] in this particular instance. And that is Danielle Bachman herself, and *** Mr. Reed, and Mr. Schneider." When counsel then asked Page what he had gleaned from those depositions, he stated, in pertinent part, as follows:

> "Well, specifically, Danielle Bachman asserts that the air bag inflated without any particular reason and knocked her hands clear of the steering wheel. ***
>
> And then she also states that—her exact words was [*sic*] 'freaking out.' She was trying to get out of a moving automobile. She was trying to unbuckle her seat belt.
>
> Then there is [*sic*] the other two witnesses that state that the car was fishtailing.
>
> This all leads me to believe that she had little, if any, control over the automobile."

Following Page's testimony, the trial court *sua sponte* reconsidered defendants' motion to preclude Page's testimony with respect to his causation opinion. The court found that (1) Page had "indicated no engineering basis for his testimony"; (2) his causation opinion was based "solely on the depositions of the three witnesses"; (3) Page had disavowed his deposition testimony that his causation opinion was based, in some unspecified way, on General Motors documents; (4) "his testimony did not tie up in any way, shape or form to any [General Motors] documents"; (5) "in essence, what he offered was solely lay opinion concerning whether or not driver error caused [Danielle] to

lose control"; and (6) in reaching his causation opinion, Page "did not employ knowledge and application of principles of science beyond the ken of the average juror." The court thus instructed the jury to disregard Page's causation opinion. The court further stated that the jury "may and will consider the six other opinions that [Page] testified to," including his opinion that the air bag in Danielle's Cavalier inadvertently deployed.

■ We conclude that the trial court did not abuse its discretion by determining that Page "did not employ knowledge and application of principles of science beyond the ken of the average juror" in reaching his opinion that the alleged inadvertent deployment of the air bag caused Danielle to lose control of her car and crash into Reed's step van. Page essentially recapitulated the deposition testimony of Danielle (some of which she repudiated at trial), Reed, and Schneider. The jury was clearly able to assess and draw inferences from the testimony of those witnesses without Page's expert testimony. Simply put, a jury does not need expert testimony to help it decide whether an inadvertently deployed air bag might cause a driver to lose control of her car. See *Coyne v. Robert H. Anderson & Associates, Inc.*, 215 Ill. App. 3d 104, 112, 574 N.E.2d 863, 868 (1991) ("Expert testimony is improper when the inquiry regards an area within the common knowledge of the average juror"); see also *Harvey v. Norfolk & Western Ry. Co.*, 73 Ill. App. 3d 74, 83, 390 N.E.2d 1384, 1390 (1979) (if the jury is competent to determine the facts at issue, then the expert opinion is of no special assistance to the jury and should not be admitted).

In addition, nothing in the record shows that Page's expertise extended to determining whether an inadvertent air-bag deployment caused Danielle to lose control of her Cavalier and crash into Reed's step van. Page was a mechanical engineer with almost 35 years' experience in the aerospace industry. However, he had no prior experience in the automobile industry or with air bags, and he professed no expertise in accident reconstruction or the effects of air-bag deployments on drivers. Page's qualifications simply did not enable him to form an opinion as to the cause of Danielle's collision. See, for example, *People v. Perry*, 147 Ill. App. 3d 272, 275, 498 N.E.2d 1167, 1169 (1986) (forensic pathologist's expertise did not extend to determining the ability of the defendant mother to feel her infant beneath her while asleep, despite the fact that he had a "special interest" in child abuse and had coauthored a paper on the topic); *Grant v. Petroff*, 291 Ill. App. 3d 795, 801, 684 N.E.2d 1020, 1024-25 (1997) (physician was qualified to opine on the standard for informed consent, but not whether the plaintiff was actually informed).

Moreover, even accepting plaintiffs' contention that the trial court

erred by striking Page's testimony on causation, we conclude that such error was harmless. A reviewing court will grant reversal based on evidentiary rulings only when the error was substantially prejudicial and affected the outcome of the trial. Conversely, where it appears that an error did not affect the outcome of the trial, or where the reviewing court can see from the entire record that the error did not result in substantial prejudice, the judgment will not be disturbed. *Simmons*, 198 Ill. 2d at 566-67, 763 N.E.2d at 736. The burden is on the party seeking reversal to establish prejudice. *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 895, 647 N.E.2d 618, 625 (1995).

Plaintiffs claim the trial court's exclusion of Page's testimony on causation was "devastating" because he was their "only liability expert." However, the court did not strike Page's opinion that the air bag in Danielle's Cavalier inadvertently deployed. In addition, Van Daele, plaintiffs' accident reconstruction expert, opined that (1) "[t]he Cavalier appeared to be driven by a person who could have been stunned" by an inadvertent air-bag deployment and (2) he "could think of no other cause for Danielle's lack of reaction to the approaching hazard of Reed's van." Further, the excluded evidence related to whether the inadvertent deployment of Danielle's air bag caused her to lose control of the Cavalier and collide with Reed's step van. However, the jury explicitly found that Danielle's air bag did not inadvertently deploy. Thus, the jury did not reach the issue of causation. Accordingly, because the error related to the causation issue, which was never reached by the jury, that error was harmless. See *Cairns v. Hansen*, 170 Ill. App. 3d 505, 512, 524 N.E.2d 939, 944 (1988) (concluding that the trial court's erroneous evidentiary ruling was harmless where the error related to an issue the jury never reached).

### C. The Trial Court's Decision To Limit the Testimony of Similar-Occurrence Witnesses

Plaintiffs next argue that the trial court erred by prohibiting plaintiffs' similar-occurrence witnesses from testifying that when the driver's-side air bags on their 1996 and 1997 J-cars inadvertently deployed, the air bags struck them and, in some cases, caused them to lose control of their cars. We disagree.

■ Evidence of prior occurrences or accidents may be admissible if relevant to the proponent's case. Generally, a prior occurrence is relevant to show (1) the existence of a particular danger or hazard or (2) the defendant's notice of the generally hazardous nature of the accident site. A plaintiff is required to lay a foundation of substantial similarity between the prior and present accidents if the plaintiff of-

fers the prior accident evidence to show a particular hazard or danger. *Mikus v. Norfolk & Western Ry. Co.*, 312 Ill. App. 3d 11, 22-23, 726 N.E.2d 95, 105 (2000). The determination whether prior occurrences or accidents are substantially similar to the one at issue lies within the trial court's sound discretion. *Sobczak v. Flaska*, 302 Ill. App. 3d 916, 929, 706 N.E.2d 990, 1001 (1998). Even if evidence is arguably relevant, the trial court may still exclude the evidence if it would confuse the issues or tend to mislead the jury. *Demos v. Ferris-Shell Oil Co.*, 317 Ill. App. 3d 41, 53, 740 N.E.2d 9, 18 (2000). As the Seventh Circuit Court of Appeals wrote in *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1269 (7th Cir. 1988):

> "As the circumstances and conditions of the other accidents become less similar to the accident under consideration, the probative force of such evidence decreases. At the same time, the danger that the evidence will be unfairly prejudicial remains. *** In addition, the costs—in terms of time, distraction and, possibly, prejudice—resulting from such evidence also may weigh against its admissibility. Accordingly, '[e]ven when substantial identity of the circumstances is proven, the admissibility of such evidence lies within the discretion of the trial judge who must weigh the dangers of unfairness, confusion, and undue expenditure of time in the trial of collateral issues against the factors favoring admissibility.' *McKinnon v. Skil Corp.*, 638 F.2d 270, 277 (1st Cir. 1981)."

See also *Ficken v. Alton & Southern Ry. Co.*, 291 Ill. App. 3d 635, 647-48, 685 N.E.2d 1, 10 (1996) (the trial court has discretion to exclude evidence not directly related to the central issue of the case if the confusion of issues resulting from its admission would not be compensated for by its usefulness in the trial). We will not reverse the trial court's decision regarding the admission of prior occurrence evidence absent an abuse of discretion. *Mikus*, 312 Ill. App. 3d at 22, 726 N.E.2d at 105.

In this case, the trial court allowed several witnesses, including Robyn Mitchell, Russell Armstrong, Patricia Crabtree, Tanya Spencer, and Beverly Stephens, to testify that they had been driving 1996 or 1997 J-cars when the driver's-side air bag inadvertently deployed, knocking their hands off the steering wheel and creating noise and smoke. However, the court excluded testimony concerning postdeployment events, including some witnesses' testimony that air bags struck them or caused them to lose control of their cars. In that regard, plaintiffs presented the following testimony in offers of proof. Mitchell's air bag hit her in the face and obscured her vision. Mitchell did not state that the deployment caused her to lose control of her car. Armstrong's air bag hit him in the face and blocked his vision. He did

not remember whether the air bag knocked his hands off the steering wheel; however, it "didn't matter because [he] was going so slowly." Crabtree's air bag hit and injured her, but it did not cause her to lose control of her car. Spencer's air bag did not hit her, nor did she lose control of her car. Stephen's air bag hit and injured her, causing her to lose control of her car. Erin Dall's air bag in her 1998 Cavalier struck her in her face. Dall did not state that the deployment caused her to lose control of her car. Finally, Leanna Snyder's air bag hit her in the arm, and she blacked out and "ended up in a culvert." However, she did not recall if the air bag hit her in the head. Unlike the other similar-occurrence witnesses, Snyder's SDM data showed a high delta-v, inconsistent with an inadvertent deployment.

At trial, plaintiffs claimed that Danielle's air bag hit her in the face, knocked her out, and caused her to lose control of the Cavalier. In contrast, none of the similar-occurrence witnesses testified that the air-bag deployment knocked them out. In addition, neither Mitchell, Armstrong, nor Dall testified that the air-bag deployment caused him or her to lose control of his or her car, and Crabtree and Spencer actually testified that the deployment did not cause them to lose control of their cars. Further, the record showed that Dall was driving a 1998 Cavalier, a model year that was not under recall.

In limiting the testimony of the similar-occurrence witnesses, the trial court stated, in pertinent part, as follows:

"[W]e are getting into another area that could be a trial within a trial as to whether or not it did, should have, would have, made contact with [the similar-occurrence witnesses'] heads within the conte[x]t of their occurrences. And so I can't see where that is going to help anyone, whether it be the plaintiff[s] or the defendant[s]. The jury needs to confine itself to what occurred in this instance and not draw conclusions, either favorably or unfavorably, as to what took place in this case based upon other occurrences.

So that general area, meaning as far as the air bag making contact with an individual, who was driving a similar car, with their head area, I don't think helps or assists the trier of fact in this case in making the determination on the issues that pertain to this case."

■ Reviewing the trial court's decision under the appropriate standard of review, we conclude that the court did not abuse its discretion by excluding the similar-occurrence witnesses' testimony that their inadvertently deployed air bags struck them and, in some cases, caused them to lose control of their cars.

Moreover, even if the exclusion of that testimony was error, we conclude that it was harmless. As earlier discussed, a reviewing court

will grant reversal based on evidentiary rulings only when the error was substantially prejudicial and affected the outcome of the trial. Conversely, where it appears that an error did not affect the outcome of the trial, or where the reviewing court can see from the entire record that the error did not result in substantial prejudice, the judgment will not be disturbed. *Simmons,* 198 Ill. 2d at 566-67, 763 N.E.2d at 736. The burden is on the party seeking reversal to establish prejudice. *Hallbeck,* 269 Ill. App. 3d at 895, 647 N.E.2d at 625. The excluded evidence related to whether the inadvertent deployment of Danielle's air bag caused her to lose control of the Cavalier and collide with Reed's step van. However, the jury explicitly found that Danielle's air bag did not inadvertently deploy and did not reach the issue of causation. Accordingly, because the error related to the causation issue, which was never reached by the jury, that error was harmless. See *Cairns,* 170 Ill. App. 3d at 512, 524 N.E.2d at 944 (concluding that the trial court's erroneous evidentiary ruling was harmless where the error related to an issue the jury never reached).

## D. The Trial Court's Decision To Allow Evidence Regarding SDM Data Downloaded from the Similar-Occurrence Witnesses' Vehicles

■ Plaintiffs next argue that the trial court erred by denying their motion *in limine* to exclude evidence regarding the SDM data downloaded from the similar-occurrence witnesses' J-cars. Specifically, they contend that (1) defendants offered the evidence regarding the similar-occurrence witnesses' delta-velocities to "negate causation" despite the fact that such causation evidence "was not permitted within the [p]laintiffs' case," (2) defendants failed to "establish foundation" for the SDM data of the similar-occurrence witnesses, and (3) evidence regarding the similar-occurrence witnesses' delta-velocities "was not probative." We disagree.

### 1. *Purpose of the SDM Data*

Plaintiffs first contend that defendants offered the evidence regarding the similar-occurrence witnesses' delta-velocities to "negate causation" despite the fact that such causation evidence "was not permitted within the [p]laintiffs' case." We disagree.

Contrary to plaintiffs' contention, the record shows that the complained-of delta-v evidence had nothing to do with the causation evidence that "was not permitted within the [p]laintiffs' case"—that is, whether the inadvertently deployed air bags struck the similar-occurrence witnesses or caused them to lose control of their cars. Instead, the delta-v evidence was offered to support defendants' theory that Danielle's air bag did not inadvertently deploy. The trial court allowed plaintiffs to present evidence showing that the similar-

occurrence witnesses' air bags inadvertently deployed, and defendants were allowed to present evidence showing that the delta-v's of those inadvertent deployments (which ranged from zero to three miles per hour) were different from Danielle's delta-v of just over 16 miles per hour. As plaintiffs ultimately concede in their brief, "[t]he jury may have easily inferred that [Danielle's] air[ ]bag did not inadvertently deploy because [Danielle's] delta-v was not in the range of 0 to 3 miles per hour." The court did not abuse its discretion by allowing defendants to present evidence central to their defense and directly responsive to plaintiffs' evidence. See *Kelley v. American Motors Corp.*, 130 Ill. App. 3d 662, 672, 474 N.E.2d 814, 821 (1985) (holding that the trial court erred by allowing the plaintiff to present accident reconstruction evidence but precluding the defendant from presenting such evidence).

### 2. *Foundation for the SDM Data*

Plaintiffs next contend that defendants failed to "establish foundation" for the SDM data of the similar-occurrence witnesses. We disagree.

The exhibits, graphs, and PowerPoint demonstrations about which plaintiffs complain set forth data that were downloaded from the SDMs in the similar-occurrence witnesses' J-cars. "Records directly generated by the computer itself are generally admissible as representing the tangible result of the computer's internal operations." *In re Marriage of DeLarco*, 313 Ill. App. 3d 107, 114, 728 N.E.2d 1278, 1286 (2000). All that need be shown is that the recording device was accurate and operating properly when the evidence was generated. *People v. Houston*, 288 Ill. App. 3d 90, 98, 679 N.E.2d 1244, 1249 (1997). The accuracy of the SDM's recording function was established during the *Frye* hearing in this case. Accordingly, we conclude that defendants satisfied the foundational requirements for the SDM-generated data from the similar-occurrence witnesses' J-cars.

We also agree with defendants that the exhibits were admissible under the business records exception to the hearsay rule. Supreme Court Rule 236(a) requires only that the party tendering the record satisfy the foundation requirement by demonstrating that the record was made in the regular course of a business at or near the time of the transaction. 145 Ill. 2d R. 236(a); *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 305, 601 N.E.2d 1055, 1064 (1992). " '[A]ll other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility.' " *Lecroy v. Miller*, 272 Ill. App. 3d 925, 935-36, 651 N.E.2d

617, 624 (1995), quoting 145 Ill. 2d R. 236(a); see also *Raithel v. Dustcutter, Inc.*, 261 Ill. App. 3d 904, 909, 634 N.E.2d 1163, 1167 (1994) (Cook, J., specially concurring) (A business can prove up records of another business which it has in its possession if it verified those records).

In this case, Nunan testified that (1) he was familiar with General Motors' records and procedures regarding the reports generated during the 1241 investigation, and (2) the SDM data was retrieved and kept in the normal course of the investigation. Up until 2000, Delphi (for whom Nunan worked) was affiliated with General Motors, and Nunan had worked on the SDM for years alongside General Motors. Nunan also stated that "[w]hen [an inadvertent-deployment] complaint came in we investigated it, and part of that would be obtaining the SDM data to try to come to a conclusion about what occurred." In addition, McConnell testified that after an inadvertent-deployment complaint was called in, the information was recorded "rather promptly" in the regular course of business. A file on the complaint would be sent to a customer assistance manager "within the same day or no later than the next business day." The manager would then send a district service manager to investigate and "retrieve that [SDM] information." Under these circumstances, we conclude that defendants satisfied the threshold requirement for admission of the SDM data under the business records exception.

### 3. *Probative Value of the SDM Data*

Last, plaintiffs contend that the evidence regarding the similar-occurrence witnesses' delta-velocities was not probative because "the vertical velocity could affect the longitudinal velocity, and thereby affect the delta-v of these 1996 and 1997 Chevrolet Cavaliers."

Plaintiffs have forfeited this argument on appeal by failing to raise that specific objection in the trial court. See *McIntyre v. Harris*, 304 Ill. App. 3d 304, 309, 709 N.E.2d 982, 985 (1999) (when an objection is made in the trial court, the specific grounds must be stated, and other grounds not stated are forfeited on appeal).

### E. The Trial Court's Denial of Plaintiffs' Motion To Bar Defendants' Opinion Witnesses for Alleged Discovery Violations

Plaintiffs next argue that the trial court erred by denying their motion *in limine*, seeking to bar defendants' opinion witnesses for alleged discovery violations. We disagree.

### 1. *Standard of Review*

■ Supreme Court Rule 219(c) provides that where a party unreasonably refuses to comply with discovery rules or orders, the

trial court may enter "such orders as are just" to remedy the situation. 166 Ill. 2d R. 219(c). The court's purpose in imposing sanctions is not to punish a party. In fashioning a sanction, the court must weigh the competing interests of the offending party's right to maintain a lawsuit against the need to accomplish the objectives of discovery and promote the unimpeded flow of litigation. *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 68, 651 N.E.2d 1071, 1081 (1995). In considering whether a particular sanction is appropriate, a court must consider the conduct of the offending party and the effect of that conduct upon the opposing party. *Smith v. P.A.C.E.*, 323 Ill. App. 3d 1067, 1075, 753 N.E.2d 353, 361 (2001). "Dismissal or entry of a default judgment is a severe sanction and should be invoked only in cases where the party's actions exhibit a deliberate, contumacious, or unwarranted disregard of the court's authority and after all the other court's enforcement powers have failed to advance the litigation." *In re Marriage of Booher*, 313 Ill. App. 3d 356, 359, 728 N.E.2d 1230, 1232-33 (2000). The decision to impose a particular sanction—if any—lies within the trial court's discretion, and only a clear abuse of discretion justifies reversal. *Blakey v. Gilbane Building Corp.*, 303 Ill. App. 3d 872, 877, 708 N.E.2d 1187, 1191 (1999).

### 2. Defendants' Alleged Failure To Timely File Interrogatory Answers

Plaintiffs first contend that the trial court erred by denying their motion *in limine*, seeking to bar defendants' 19 expert and lay opinion witnesses based on defendants' failure to timely file answers to interrogatories. Specifically, they contend that "[d]efendants introduced numerous exhibits and testimony by its witnesses, including Doug Nunan's testimony, that were never disclosed by way of [Rule] 213(g) interrogatory [(177 Ill. 2d R. 213(g))] to the surprise and prejudice to [p]laintiffs."

■ Initially, we note that plaintiffs failed to make contemporaneous objections on this ground during the testimony of 16 of defendants' 19 opinion witnesses. (The record shows that plaintiffs raised contemporaneous Rule 213(g) objections only during the testimony of Sonye (which the trial court sustained), Law, and McKenna.) Although plaintiffs objected during Nunan's testimony regarding the delta-velocities of the similar-occurrence witnesses' J-cars (which is the only testimony about which plaintiffs specifically complain on appeal), those objections were on the grounds of (1) foundation and (2) relevance, not Rule 213(g). Plaintiffs thus have forfeited this issue on appeal, except as it relates to Law and McKenna (which we address in section II. H. 2 below). See *Jones v. Chicago Osteopathic Hospital*, 316

Ill. App. 3d 1121, 1132, 738 N.E.2d 542, 552 (2000) ("Because an *in limine* order always remains subject to reconsideration by the court during trial, an *in limine* motion, whether granted or denied, does not preserve issues for review"); *Zook v. Norfolk & Western Ry. Co.*, 268 Ill. App. 3d 157, 162, 642 N.E.2d 1348, 1352 (1994) ("When a motion *in limine* is denied, the unsuccessful movant must specifically object to the evidence when it is offered by the other party at trial"); see also *Ficken*, 291 Ill. App. 3d at 645, 685 N.E.2d at 8 (a party must state specific grounds for any objections, and other grounds not stated are waived on review).

Moreover, we agree with the trial court's ruling on the merits. The record shows that on April 25, 2000, the court entered a case management conference order, providing that (1) "[a]ll written discovery [was to] be completed by June 1, 2000," (2) defendants were to disclose opinion witnesses in accordance with the requirements of Supreme Court Rule 213(g) by August 6, 2000, and (3) plaintiffs were to complete depositions of defendants' opinion witnesses by September 6, 2000. On July 24, 2000, plaintiffs served defendants with purported Rule 213(g) interrogatories, which sought information beyond that required by Rule 213(g). (For example, the interrogatories sought each witness's prior employment history and a description of other litigation in which each had consulted.) On August 2, 2000, defendants objected that the interrogatories were overbroad and untimely. Nonetheless, defendants offered to disclose in "full compliance with Rule 213(g)" and the court's April 2000 order by plaintiffs' August 6, 2000, deadline. The record shows that defendants submitted their interrogatory answers on August 7, 2000. Defendants listed 19 potential opinion witnesses, set out each witness's qualifications, the subject matter about which each would testify, the witnesses' opinions and bases therefor, and attached the witnesses' reports.

On September 25, 2000, plaintiffs moved to bar all 19 of defendants' opinion witnesses for defendants' failure to answer plaintiffs' interrogatories. Following an October 2000 hearing, at which plaintiffs admitted that their interrogatories exceeded the scope of Rule 213(g), the trial court denied plaintiffs' motion, stating, in pertinent part, as follows:

"The [c]ourt notes that [plaintiffs'] [Rule] 213(g) interrogatories were served upon the defendants past the discovery cutoff date, that the discovery request went beyond that provided by Supreme Court Rule 213 and that [c]ounsel for defense did not ignore those interrogatories but did provide substantial compliance with the rule within their answers.

In addition, most of the witnesses have either been disclosed

along with their opinions and deposed as well and/or now, based upon the [c]ourt's earlier ruling today, will not be allowed to testify."

Under these circumstances, we conclude that the trial court did not clearly abuse its discretion by denying plaintiffs' motion to bar defendants' 19 opinion witnesses. Indeed, plaintiffs do not contest on appeal the court's finding that plaintiffs' interrogatories "went beyond" Rule 213(g) (177 Ill. 2d R. 213(g)).

■■ Although not set out as a separate argument, plaintiffs also contend that the trial court erred by denying their motion to bar defendants' 19 expert and lay opinion witnesses because "[i]t is undisputed that defendants failed to timely respond" to plaintiffs' November 18, 1998, document request. Plaintiffs have forfeited this issue on appeal by failing to raise it in the trial court. We will not reverse the trial court's decision based on an argument the trial court never heard. *See f v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 23, 724 N.E.2d 115, 127 (1999).

### 3. Defendants' Alleged Failure To Allow Plaintiffs To Redepose Certain Witnesses

■■ Plaintiffs next contend that the trial court erred by denying their motions to bar Everest, Schultz, Sonye, Mercer, B.J. Turner, and Gary Bahling from testifying on the ground that defendants refused to allow plaintiffs to redepose those witnesses following the filing of defendants' Rule 213(g) answers. Specifically, they contend that "as [d]efendants refused to allow [p]laintiffs to redepose these witnesses, [p]laintiffs were precluded from determining the opinions of these witnesses, which may have aided [p]laintiffs in the trial."

Plaintiffs have forfeited this issue on appeal by calling as witnesses the only four of those six witnesses who testified at trial. See *Chubb/Home Insurance Cos. v. Outboard Marine Corp.*, 238 Ill. App. 3d 558, 568, 606 N.E.2d 423, 430 (1992) ("A party cannot complain of evidence which he himself introduced or brought out"). Further, we note that at the October 2000 hearing on plaintiffs' motions, defendants twice offered to allow plaintiffs to redepose those witnesses, but plaintiffs failed to exercise that opportunity.

Moreover, even accepting plaintiffs' contention that the trial court erred by denying plaintiffs' motions to bar those six witnesses from testifying, plaintiffs have failed to meet their burden of showing prejudice that affected the outcome of the trial. See *Hallbeck*, 269 Ill. App. 3d at 895, 647 N.E.2d at 625 (the burden is on the party seeking reversal to establish prejudice). Plaintiffs' bald assertion that the trial court's "refusal to bar these opinion witnesses constituted reversible

error and severe prejudice to the [p]laintiffs herein, as a matter of law" does not show substantial prejudice affecting the outcome of the trial.

### 4. Defendants' Disclosure of Certain Documents Fewer Than 60 Days Before Trial

■ Plaintiffs also contend that the trial court erred by denying their motion to bar defendants' opinion witnesses based on defendants' disclosure of approximately 13,000 pages of documents fewer than 60 days before trial. Plaintiffs acknowledge that the court sanctioned defendants by ordering that (1) plaintiffs themselves could use any untimely produced document; and (2) only if plaintiffs used such a document could defendants use the same document in their defense. However, they contend that the court's order "was insufficient and inadequate to cure the prejudice and surprise of the late disclosure." We disagree.

In August 1999, in response to plaintiffs' request for production, defendants produced a copy of its "crash and sled test" database for 1996 and 1997 J-cars and invited plaintiffs to select those tests for which they wanted reports, video, or test set-up sheets. In April 2000, defendants reminded plaintiffs of the list of crash and sled tests; however, plaintiffs apparently never selected any of the crash tests for production. On May 31, 2000, plaintiffs served a supplemental production request, and in mid-September 2000, defendants produced a 100-page software definition document for the SDM and approximately 3,600 pages of crash test materials.

Later in September 2000, plaintiffs filed a motion for discovery sanctions, pursuant to Supreme Court Rule 219 (166 Ill. 2d R. 219), seeking either (1) judgment on the issue of liability or (2) to "bar any and all evidence, expert and nonexpert" relating to the SDM. At the September 2000 hearing on plaintiffs' motion for sanctions, defendants informed the trial court that more crash test documents would be forthcoming. The court told defendants to produce those documents and informed the parties that those documents would also be subject to the court's order on plaintiffs' motion. In October 2000, the court entered a written order, finding that the documents produced in September 2000 were not timely disclosed and ordering that those documents "shall not be used or relied on by [d]efendant[s] at trial" but that plaintiffs "may use any of the aforesaid documents," and if they did, defendants could use "any of the same" in their defense or rebuttal. The court also found that in August 1999, defendants had timely produced a substantially identical software definition document for the SDM (product definition document). (Plaintiffs acknowledged

that the software definition document produced in September 2000 was "duplicitous in a lot of respects" of the product definition document.)

On October 9, 2000, defendants produced the additional crash test documents (totaling approximately 10,000 pages). Later that month, plaintiffs filed a second motion for sanctions, alleging that defendants had untimely disclosed the crash test documents and the software definition document and once again seeking either (1) judgment on the issue of liability or (2) to "bar any and all evidence, expert and nonexpert" relating to the SDM.

Following a November 2000 hearing, the trial court reaffirmed its prior ruling and denied plaintiffs' second motion for sanctions. In so doing, the court stated, in pertinent part, as follows:

"With regard to plaintiff[s'] second motion for sanctions, the court has previously held the documents submitted by the defendants on September 14 of this year were untimely, and that although plaintiffs would be permitted to use any of those documents at trial, the defendants could not unless the plaintiffs used them first.

\* \* \*

Any crash test that was produced after September 14 of this year by defendants to the plaintiff may not be used unless the plaintiff[s] use[ ] them first. The court did in fact direct the defendants to produce those reports on September 22 subject to those conditions. So there is nothing new, in essence, which I have dealt with thus far based upon the court's prior order.

With regard to the sensing algorithm, there is material in both documents \*\*\* the software definition document and the product definition document that pertains to this issue.

\* \* \*

Further, there was testimony \*\*\* [that] the product definition document and the calibration specifications \*\*\* were provided prior to the September materials being provided to the plaintiff[s], and that that information would have been sufficient for plaintiff[s'] expert or experts in order to render an opinion contrary to or in opposition to what is anticipated that defendants' experts will be testifying to in this matter."

Under the circumstances of this case, we conclude that the trial court did not clearly abuse its discretion by denying plaintiffs' motion to bar defendants' opinion witnesses, and instead, ordering that documents produced on or after September 14, 2000, could not be used by defendants unless plaintiffs first used them. See *Martinez v. Pfizer Laboratories Division*, 216 Ill. App. 3d 360, 373, 576 N.E.2d 311, 320

(1991) ("[A] 'just order' under Rule 219(c) is one which, to the degree possible, ensures both the accomplishment of discovery and a trial on the merits"); see also *Booher*, 313 Ill. App. 3d at 361, 728 N.E.2d at 1234 ("A reasonable sanction for failure to comply with an order for discovery providing information *** when much of the information was already disclosed in previous discovery, would be one barring [the offending party] from contradicting or going beyond the discovery materials provided *on those matters*" (emphasis in original)).

### F. The Trial Court's Decision Permitting the Jury To View Danielle's Damaged Cavalier

■ Plaintiffs next argue that the trial court erred by permitting the jury to view Danielle's damaged Cavalier during defendants' case in chief. Specifically, they contend that the jury's viewing of the Cavalier constituted an abuse of discretion "since both parties had hundreds of photographs accurately and truly portraying the damage to [Danielle's] vehicle." We disagree.

Demonstrative evidence has no probative value in itself but serves as a visual aid to the jury in comprehending witnesses' verbal testimony. *Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 337, 729 N.E.2d 536, 545 (2000); see *Lundquist v. Nickels*, 238 Ill. App. 3d 410, 427, 605 N.E.2d 1373, 1385 (1992) (the jury's viewing of property involved in the litigation "does not constitute evidence, but is merely a device to facilitate the jury's understanding and application of the evidence to the issues presented at trial"). Courts look favorably upon the use of demonstrative evidence, because it helps the jury understand the issues raised at trial. *People v. Burrows*, 148 Ill. 2d 196, 252, 592 N.E.2d 997, 1022 (1992); *Schuler*, 313 Ill. App. 3d at 337, 729 N.E.2d at 545. The considerations in determining whether demonstrative evidence should be allowed are relevancy and fairness, and the decision whether to allow a party to present demonstrative evidence lies within the trial court's discretion. *Schuler*, 313 Ill. App. 3d at 337, 729 N.E.2d at 545. Thus, we will not reverse a trial court's decision regarding demonstrative evidence absent a clear abuse of discretion. *Herman v. Will Township*, 284 Ill. App. 3d 53, 62, 671 N.E.2d 1141, 1147 (1996).

In this case, the damage to Danielle's Cavalier was clearly relevant. Plaintiffs' own accident-reconstruction expert, Van Daele, acknowledged that to determine what happened in the accident, "the best thing would be to actually look at the vehicle as opposed to a two-dimensional photograph."

Nor was the jury's viewing of the Cavalier unfair or confusing. Prior to the jury's viewing, the trial court admonished the jury that

the viewing was a "demonstrative aid *** to assist [the jurors] in understanding the testimony that ha[d] been elicited by the witnesses and the exhibits *** which ha[d] been received into evidence." After the viewing, the court also explained to the jury that videotape had been taken of the Cavalier to ensure that a complete record of the trial proceedings was made. The jury's viewing of the Cavalier was simply an aid used to explain the collision between Reed's step van and Danielle's Cavalier, a topic the witnesses would testify about with or without the viewing. Indeed, during cross-examination of Thebert, defendants' accident-reconstruction expert, plaintiffs' counsel stated that plaintiffs wanted the jury "to see this damage to the vehicle." Under these circumstances, we conclude that the trial court did not abuse its discretion by allowing the jury to view Danielle's Cavalier.

Although not set out as a separate argument, plaintiffs also argue that they were "severely prejudiced" when Thebert "expressly and impliedly testified that the viewing of [Danielle's] vehicle would establish certain facts, which supported his testimony." As defendants correctly point out, plaintiffs did not object to Thebert's testimony (in which he suggested that the jury focus on particular parts of the Cavalier, including the left rear suspension area, the inside of the car, and the paint transfer). Thus, plaintiffs have forfeited this issue on appeal. See *Kotvan*, 321 Ill. App. 3d at 750, 747 N.E.2d at 1059 (" 'Preservation of a question for review requires an appropriate objection in the court below [citation], and failure to object constitutes waiver.' *Williamsburg*, 200 Ill. App. 3d at 479, 558 N.E.2d at 211").

### G. The Trial Court's Decision Allowing Seckler To Testify Regarding the Dangerousness of the Curve Where Danielle's Collision Occurred

■■ Plaintiffs also argue that the trial court erred by denying plaintiffs' motion *in limine* seeking to preclude Seckler from testifying that based on her personal experience, if a person drives around the curve at more than 35 miles per hour, that person could lose control and cross the centerline. Specifically, they contend that Seckler's testimony was "irrelevant and immaterial" and prejudicial to plaintiffs' case. We disagree.

Generally, relevant evidence is admissible. *Hiscott v. Peters*, 324 Ill. App. 3d 114, 124, 754 N.E.2d 839, 849 (2001). "Evidence is relevant if it tends to either prove a fact in controversy or render a matter in issue more or less probable, and each party may present evidence relevant to his theory of the case or inconsistent with an opponent's theory." *Galowich v. Beech Aircraft Corp.*, 209 Ill. App. 3d 128, 135, 568 N.E.2d 46, 50 (1991). The determination as to what is relevant

evidence is a matter within the trial court's sound discretion, and we will not disturb the trial court's determination absent an abuse of that discretion. *Schuler*, 313 Ill. App. 3d at 336, 729 N.E.2d at 544.

In this case, the trial court carefully weighed the parties' arguments and determined that the disputed evidence would be admitted. Reviewing the record, we cannot say that the court's decision in this regard was "arbitrary, fanciful[,] or unreasonable." *Illgen*, 145 Ill. 2d at 364, 583 N.E.2d at 519 (discussing the abuse of discretion standard).

In so concluding, we note that plaintiffs' contention that Seckler's testimony was "irrelevant" and "immaterial" is belied by plaintiffs' concession in their brief that the testimony "gave credence to" and "conveyed to the jury" defendants' theory of the case—that the collision was not caused by the inadvertent deployment of Danielle's air bag, but by Danielle's speeding. See *Sobczak*, 302 Ill. App. 3d at 929, 706 N.E.2d at 1000 ("It is well settled that evidence is relevant under Illinois law when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence").

Moreover, even accepting plaintiffs' contention that the trial court erred by allowing Seckler's testimony, our review of the record shows that the error was harmless. Seckler's testimony regarding the danger of losing control on the Nofsinger Road curve was largely cumulative of several of plaintiffs' own witnesses. Both William Gray and Van Daele testified that the curve was dangerous, and Van Daele acknowledged that when he inspected the scene following the collision, he saw cars go into the opposite lane of traffic as they were attempting to negotiate the curve. Schneider testified that at speeds of 45 to 50 miles per hour, the bumps on Nofsinger Road present a problem. In addition, Ricki Gray testified that when driving her car around the curve near the "rippled" section of the road, it gave her the "feeling that [she] want[ed] to lose control." See *People v. Sparks*, 314 Ill. App. 3d 268, 273, 731 N.E.2d 987, 991 (2000) (concluding that error in admitting certain evidence was harmless when the jury was "presented with [the same] version of events independently of any prejudicial effect that the error may have had").

### H. The Trial Court's Decision To Allow Evidence Regarding Danielle's Seat Belt Use and the Condition of Her Seat Belt Following the Collision

■ Plaintiffs next argue that the trial court erred by granting defendants' motion *in limine* to allow McKenna to testify that (1) Danielle was wearing her seat belt during the collision; and (2) his postcollision inspection of her seat belt showed physical signs of

Danielle's forward movement during the collision. Specifically, they contend that (1) section 12—603.1(c) of the Illinois Vehicle Code (Vehicle Code) prohibits evidence that a person used a seat belt (625 ILCS 5/12—603.1(c) (West 1996)) and (2) defendants did not adequately disclose McKenna's opinions, pursuant to Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)). We disagree.

Initially, we note that plaintiffs have forfeited this issue on appeal by calling several witnesses who testified that Danielle was wearing her seat belt during the collision. See *Chubb/Home Insurance Cos.*, 238 Ill. App. 3d at 568, 606 N.E.2d at 430 ("A party cannot complain of evidence which he himself introduced or brought out").

Even assuming plaintiffs had not forfeited this issue on appeal, we conclude that the trial court did not abuse its discretion by allowing McKenna's seat-belt testimony.

### 1. *Section 12—603.1(c) of the Vehicle Code*

Plaintiffs first contend that the trial court should have excluded McKenna's testimony that Danielle was wearing her seat belt during the collision, pursuant to section 12—603.1(c) of the Vehicle Code (625 ILCS 5/12—603.1(c) (West 1996)). We disagree.

Section 12—603.1(c) of the Vehicle Code provides, in pertinent part, that "[f]ailure to wear a seat safety belt in violation of this [s]ection shall not be considered evidence of negligence." 625 ILCS 5/12—603.1(c) (West 1996). That section does not preclude all seat-belt evidence, but only evidence of nonuse in determining whether the person was negligent in failing to utilize the vehicle's seat-belt system.

In rejecting the argument that McKenna's testimony was prohibited under section 12—603.1(c), which was set forth in plaintiffs' response to defendants' motion *in limine*, the trial court stated as follows:

"[Regarding t]he motion *in limine* to admit evidence concerning the seat belt, the court finds that the relevant statutory provision, 625 ILCS 5/12—603.1(c) [(West 1996)], is inapplicable. The statute addresses the failure to wear seat belts. The purpose of the testimony that is sought to be introduced in this case has nothing to do with [Danielle's] negligence or [with] minimiz[ing] the damages of the plaintiff[s].

The evidence of the seat[-]belt use is relevant for the limited purpose of establishing whether or not [Danielle] was involved in a frontal [or] side[-]impact collision.

The defendants[ ] ought and will be allowed to contest the plaintiffs' claim of inadvertent deployment."

We agree with the trial court. We thus conclude that the court did not abuse its discretion by allowing McKenna to testify that Danielle was

wearing her seat belt during the collision. See *City of Quincy v. Diamond Construction Co.*, 327 Ill. App. 3d 338, 343, 762 N.E.2d 710, 714 (2002) (a reviewing court will not reverse a trial court's decision to grant or deny a motion *in limine* absent a clear abuse of discretion).

### 2. *Supreme Court Rule 213(g)*

Plaintiffs also contend that the trial court abused its discretion by allowing McKenna's seat-belt testimony because defendants did not adequately disclose his opinions, pursuant to Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)). Specifically, they assert that the court erred by determining that McKenna's testimony (that the marks on Danielle's seat belt showed physical signs of her forward movement during the collision) was not encompassed by McKenna's original opinion set forth in his interrogatory answers that "some plastic and other load carrying parts [of the seat belt] were clearly marked from occupant forces." We disagree.

Supreme Court Rule 213(g) requires that parties disclose the subject matter, conclusions, opinions, qualifications, and all reports of a witness who will offer any opinion testimony. *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 469, 758 N.E.2d 442, 451 (2001). At trial, a witness may elaborate on a properly disclosed opinion (*Becht v. Palac*, 317 Ill. App. 3d 1026, 1037, 740 N.E.2d 1131, 1140 (2000)), and "[t]he fact that trial testimony is more precise than the opinion as originally disclosed does not necessarily result in a violation" (*Prairie v. Snow Valley Health Resources, Inc.*, 324 Ill. App. 3d 568, 576, 755 N.E.2d 1021, 1029 (2001)). However, the witness's testimony must be encompassed by the original opinion. *Becht*, 317 Ill. App. 3d at 1037, 740 N.E.2d at 1140. A trial court's decision regarding whether an opinion has been adequately disclosed such that it may be admitted into evidence is a matter committed to the trial court's sound discretion. *Prairie*, 324 Ill. App. 3d at 576, 755 N.E.2d at 1029; *Sinclair*, 325 Ill. App. 3d at 469, 758 N.E.2d at 451. Thus, we will not reverse the trial court's decision on this matter absent an abuse of discretion. *Sinclair*, 325 Ill. App. 3d at 469, 758 N.E.2d at 451.

In rejecting plaintiffs' argument that McKenna's testimony was not encompassed by his original opinion, the trial court found as follows: "All those opinions have been disclosed, [McKenna] has been examined. There is no new opinion which he is offering which would constitute any surprise or unfair prejudice to the plaintiffs." Reviewing the trial court's decision under the appropriate standard of review, we conclude that the court did not abuse its discretion by determining that McKenna's testimony was an elaboration on his original opinion.

## I. The Trial Court's Decision To Submit a Special Interrogatory to the Jury

■ Plaintiffs next argue that the trial court erred by submitting the following special interrogatory to the jury: "Did the driver's side air bag inadvertently deploy on November 6, 1996?" Specifically, they contend that (1) the special interrogatory was "defective as it obviously could not control the general verdict"; (2) the trial court "advocate[d]" for defendants by "informing counsel for defendants that if certain language was set forth in the interrogatory, the court would be inclined to accept it"; and (3) the jury was misled and confused by the interrogatory. We disagree.

### 1. *Form of the Special Interrogatory*

Plaintiffs first contend that the special interrogatory was "obviously defective."

Initially, we note that plaintiffs have forfeited this issue on appeal by withdrawing their objection to the form of the special interrogatory. See *Green v. Bernstein,* 238 Ill. App. 3d 656, 658, 606 N.E.2d 500, 502 (1992) ("It is well settled that a failure to specifically object to a special interrogatory will waive any objection in the giving of that special interrogatory").

Even assuming that plaintiffs had not forfeited this issue, we conclude that the special interrogatory was in proper form. Section 2—1108 of the Code provides as follows:

"The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon[,] and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2—1108 (West 1996).

In *Simmons,* 198 Ill. 2d at 563, 763 N.E.2d at 734-35, our supreme court reviewed the law regarding the proper form for special interrogatories and wrote the following:

"[A] special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned. [Citations.] In addition, it should be a single question, stated in terms that are simple, unambiguous, and understandable; it should not be repetitive, confusing, or misleading. [Citation.] It need not contain all of the

elements of negligence and is proper if it focuses on one element that is dispositive of the claim."

Further, in assessing the form of a special interrogatory, the court need not determine whether both a positive and negative answer thereto could control all possible general verdicts. "Rather, a special interrogatory is proper if *some* response to [it] could serve to test *some* general verdict returned by the jury." (Emphasis in original.) *Eaves v. Hyster Co.*, 244 Ill. App. 3d 260, 266, 614 N.E.2d 214, 218 (1993).

Based on these principles, we conclude that defendants' special interrogatory was in proper form. The interrogatory presented a single and direct question; its terms were simple, understandable, and unambiguous; it was not misleading or repetitive; and a negative response to it would control an inconsistent general verdict by the jury in plaintiffs' favor.

### 2. *The Trial Court's Alleged Assistance in Wording the Special Interrogatory*

Plaintiffs also contend that the trial court "advocate[d]" for defendants by "informing counsel for defendants that if certain language was set forth in the interrogatory, the court would be inclined to accept it." According to plaintiffs, "the record will reflect that [d]efendants may have been unable to submit a special interrogatory that the court would have granted." We disagree.

Contrary to plaintiffs' contention, the record clearly shows that defendants' counsel, not the trial court, suggested the special interrogatory that was given. During the jury instruction conference, defendants submitted the special interrogatory, which then provided as follows: "Have the plaintiffs proven by a preponderance of the evidence that the driver's side air[ ]bag inadvertently deployed on November 6, 1996?" Plaintiffs objected, alleging that the form was improper and the interrogatory included improper language regarding the burden of proof. Defendants' counsel then stated, in pertinent part, as follows: "With respect to the form, I do think the interrogatory is proper. If plaintiffs have a problem with using 'preponderance of the evidence,' the interrogatory could be changed to was, you know, [']did the driver's side air bag inadvertently deploy on November 6, 1996[?', which] would take the [']burden['] language out if that is unacceptable." The trial court accepted that suggested language and agreed to submit the interrogatory to the jury. Indeed, plaintiffs' counsel "acknowledge[d] for the record" that defendants' counsel, not the trial court, suggested the special interrogatory given.

### 3. *Plaintiffs' Claim That the Jury Was Confused and Misled by the Special Interrogatory*

Last, plaintiffs contend that the jury was confused and misled by

the special interrogatory because the jury did not initially answer the interrogatory when it returned the general verdict. Plaintiffs make this bald assertion without citation either to authority or the record. A point raised but not argued or supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(e)(7) (188 Ill. 2d R. 341(e)(7)). *Rivera v. Arana*, 322 Ill. App. 3d 641, 648, 749 N.E.2d 434, 440 (2001). Accordingly, plaintiffs have forfeited this issue on appeal.

Moreover, the mere fact that the jury initially returned a general verdict in defendants' favor without answering the special interrogatory does not manifest confusion on the jury's part. With the parties' agreement, the trial court resubmitted the interrogatory to the jury and instructed it to answer and sign it. Once the court clarified the procedure, the jury returned the unanimous negative response consistent with its general verdict. Any "confusion" on the jury's part regarded procedure, not the actual question posed. See generally *Simmons*, 198 Ill. 2d at 566, 763 N.E.2d at 736 (jury's questions regarding the purpose and necessity of answering a special interrogatory did not display confusion on the jury's part).

## J. Plaintiffs' Claim That the Verdict Was Against the Manifest Weight of the Evidence

Plaintiffs also argue that the jury verdict was against the manifest weight of the evidence. We disagree.

A reviewing court will set aside a jury's verdict only if it was against the manifest weight of the evidence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242, 665 N.E.2d 1260, 1274 (1996). Under this standard of review, we will reverse a jury verdict only (1) if it is unreasonable, arbitrary, and not based on evidence, or (2) when the opposite conclusion is clearly apparent to us. *O'Donnell v. Holy Family Hospital*, 289 Ill. App. 3d 634, 643, 682 N.E.2d 386, 393 (1997). Reviewing courts should scrutinize the evidence but may not sit as a second jury and reweigh the evidence or reevaluate the credibility of the witnesses, especially where conflicting opinion testimony is introduced at trial. *O'Donnell*, 289 Ill. App. 3d at 643, 682 N.E.2d at 393.

This case involved a battle of witnesses—both lay and expert. Witnesses qualified in their fields stated their opinions and gave their reasons for those opinions. Not surprisingly, plaintiffs' experts did not agree with the defense experts. It was the jury's job to listen to the conflicting evidence in this case and use its best judgment to determine where the truth could be found. The jury found in favor of defendants and against plaintiffs, and this court "should not usurp the function of the jury and substitute its judgment on questions of fact fairly

submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508, 512 (1992). We therefore will not disturb the jury's determination here.

### K. The Trial Court's Denial of Plaintiffs' Motion for Punitive Damages

■ Plaintiffs next argue that the trial court erred by denying plaintiffs' motion to amend their complaint to add a punitive damages prayer, pursuant to section 2—604.1 of the Code (735 ILCS 5/2—604.1 (West 1996)).

In light of the jury's verdict in favor of defendants and against plaintiffs (which we concluded was not against the manifest weight of the evidence), plaintiffs have not proved that they suffered damage. Punitive damages " 'are in addition to compensatory damages and cannot be allowed unless actual damage is shown.' " *Hayman v. Autohaus on Edens, Inc.*, 315 Ill. App. 3d 1075, 1078, 734 N.E.2d 1012, 1015 (2000), quoting *In re Application of Busse*, 124 Ill. App. 3d 433, 438, 464 N.E.2d 651, 655 (1984); see also *Florsheim v. Travelers Indemnity Co. of Illinois*, 75 Ill. App. 3d 298, 310, 393 N.E.2d 1223, 1233 (1979) ("the plaintiff can only be awarded punitive damages where actual damage is shown"). Accordingly, we need not address plaintiffs' punitive damages argument.

Moreover, reviewing the record, we conclude that the trial court did not err by denying plaintiffs' motion to amend their complaint to add a prayer for punitive damages. See *Stojkovich v. Monadnock Building*, 281 Ill. App. 3d 733, 742-43, 666 N.E.2d 704, 711 (1996) (appellate court reviews *de novo* a trial court's denial of a section 2—604.1 motion to amend). Section 2—604.1 of the Code provides, in pertinent part, as follows:

"In all actions on account of bodily injury ***, based on negligence, or product liability based on any theory or doctrine, where punitive damages are permitted[,] no complaint shall be filed containing a prayer for relief seeking punitive damages. However, a plaintiff may, pursuant to a pretrial motion and after a hearing before the court, amend the complaint to include a prayer for relief seeking punitive damages. The court shall allow the motion to amend the complaint if the plaintiff establishes at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." 735 ILCS 5/2—604.1 (West 1996).

In determining whether plaintiffs met their burden of establishing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages, we are guided by what our supreme court stated in *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414-16, 563 N.E.2d 397, 401-02 (1990):

"Punitive, or exemplary, damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. [Citations.] Because of their penal nature, punitive damages are not favored in the law. [Citations.] Appropriately enough, the initial decision whether punitive damages may be imposed in a particular case in this State is a matter normally reserved to the trial judge. [Citations.]

Describing the circumstances in which an award of punitive damages is appropriate, this court in *Kelsay v. Motorola, Inc.*, [74 Ill. 2d 172, 186, 384 N.E.2d 353, 359 (1978),] stated:

'It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others [citation]. Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future. [Citation.]

See also Restatement (Second) of Torts § 908(2) (1979) ('Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others').

\*\*\* It must be recognized, however, that '[n]egligence is not the same as wantonness' [citation], and that '[p]unitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence' [citation]. 'Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate—which is to say, conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others.' [Citation.] In this context, willful and wanton misconduct ' "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." ' [Citation.]"

Judged in accordance with these standards, the evidentiary material before the trial court at the time it denied plaintiffs' section 2—604.1 motion did not establish conduct on defendants' part rising to the level of wrongdoing necessary to justify an award of punitive

damages. We agree with the trial court, which stated, in pertinent part, as follows in denying plaintiffs' motion:

"According to the uncontroverted evidence submitted by the defendant[s], [General Motors] sold 364,575 J-cars in the 1996 model year: 268,585 Cavaliers and 95,990 Pontiac Sunfires. The 31 prior incidents of which [General Motors] received notice represent approximately .008% of the total production of 1996 Cavaliers and Sunfires, or one accident for every 11,760 vehicles sold. Although no figures were presented to the court, utilizing the same analysis of number of prior incidents to miles driven by those same vehicles would result in an infinitesimal percentage. Either meager percentage could not have put [General Motors] on notice that the 1996 Chevrolet Cavaliers and Pontiac Sunfires had a defect which would cause the inadvertent deployment of the vehicle's air bag in circumstances similar to the incident of November 6, 1996."

See *Loitz*, 138 Ill. 2d at 420, 430, 563 N.E.2d at 404, 408 (reversing award of punitive damages where 94 prior accidents reflected about 0.003% of production and "even smaller percentage" of uses (gun)); *Kopczick v. Hobart Corp.*, 308 Ill. App. 3d 967, 974-75, 979, 721 N.E.2d 769, 776, 779 (1999) (reversing award of punitive damages where 30 prior incidents reflected roughly 0.5% of production and 0.0000007% of estimated number of uses (cuts of meat)). Accordingly, we conclude that the court did not err by denying plaintiffs' section 2—604.1 motion to amend their complaint to add a prayer for punitive damages.

## L. Plaintiffs' Claim That the Trial Court's Cumulative Errors Denied Them a Fair Trial

Last, plaintiffs argue that the trial court's cumulative errors denied them a fair trial. Given our resolution of the aforementioned alleged errors, we conclude that the cumulative error doctrine does not apply to this case. See *People v. Bradley*, 220 Ill. App. 3d 890, 904-05, 581 N.E.2d 310, 320 (1991) (holding that the cumulative error doctrine did not apply where the "few errors [that] occurred at trial" did not prejudice the defendant).

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON, J., concurs.

JUSTICE MYERSCOUGH, specially concurring in part and dissenting in part:

I agree that the court correctly allowed into evidence data downloaded from the SDM and the related testimony. However, I respectfully disagree with the majority's opinion affirming the trial court's *sua sponte* striking plaintiff's expert's opinion on causation. This court found Page " 'did not employ knowledge and application of principles of science beyond the ken of the average juror' " 332 Ill. App. 3d at 784 and, therefore, struck Page's testimony on causation and instructed the jury to disregard it. The majority affirmed on this issue but went on to point out that a jury does not need expert testimony to help it decide whether an inadvertently deployed air bag caused a driver to lose control of her car. This reasoning is circular. The majority affirms the trial court's finding that defendant was not an expert, but then states expert testimony on causation is not necessary to determine whether an air bag may cause a driver to lose control of her car.

First, I believe expert testimony on this issue may be persuasive and certainly can assist the trier of fact in understanding the evidence. Page was a mechanical engineer with 35 years of experience in the aerospace industry. Page's testimony was based on everything he reviewed in this case, including General Motors' documents, previous inadvertent deployments, the report of road conditions, and witnesses' accounts, to reach the conclusion of inadvertent deployment and then causation. The causation opinion cannot be reached without the deployment opinion. These opinions cannot be isolated.

Page's qualifications are certainly greater than this court's to determine causation in this case. At trial, defendants could cross-examine Page on the bases for his opinion and thereby discredit that opinion. But, for the court to emphasize the plaintiff's expert's lack of qualifications by striking on its own motion part, perhaps the most crucial part, of the plaintiff's testimony is an abuse of discretion and reversible error. The trial court's action here was highly prejudicial to plaintiff's case.

Defendants had filed their motion *in limine* in October 2000, months prior to trial, seeking to block Page's testimony. In November 2000, the trial court denied the motion. It was not until the middle of the jury trial that the court barred the testimony, surprising plaintiff and leaving plaintiff without a causation expert.

The majority finds this error harmless because the jury did not reach the question of causation, deciding only that the air bag did not deploy. However, in the absence of any of plaintiff's causation testimony, the jury logically could find the air bag did not deploy.

Moreover, if expert testimony is not necessary on causation, why cannot defendants, or anyone else for that matter, testify to their opinion on causation? This is not testimony on the ultimate issue in the case—was defendant negligent?—so Page should have been permitted to testify. Moreover, Page was plaintiff's only expert who testified to causation. Plaintiff's reconstruction expert did not give an opinion regarding the air bag actually being deployed:

" '[t]he Cavalier appeared to be driven by a person who could have been stunned, but not certainly out of control'; and (2) he could think of no other cause for Danielle's lack of reaction to the approaching hazard of Reed's step van." 332 Ill. App. 3d at 776.

A vehicle appearing to be driven by one who could have been stunned, and being unable to think of no cause for lack of driver reaction, hardly states an opinion that an air bag deployment caused the accident. The lack of an expert on causation and the impact of striking Page's testimony were clearly prejudicial and a surprise to plaintiffs. The trial court clearly abused its discretion and committed reversible error.